James W. SAUNDERS, Appellant,

v.

REORGANIZED SCHOOL DISTRICT NO. 2 OF OSAGE COUNTY, Respondent.

No. 58573.

Supreme Court of Missouri,

Division No. 2.

March 10, 1975.

John L. Hearne, Keyes & Hearne, Jefferson City, for teacher-appellant.

Carson, Inglish, Monaco & Coil, John W. Inglish, William Carr Lane, Jefferson City, for Board of Education, respondent.

HENRY I. EAGER, Special Commissioner.

In this case James W. Saunders, a tenured teacher at Linn Technical Junior College in Osage County, seeks reinstatement after discharge by the School Board, with back pay since December 21, 1971. Saunders was an English teacher, but the department was described as "Communications," it being considered as merely ancillary to the major courses. The decision of the Board was rendered on August 8, 1972; Saunders filed with the Board his notice of appeal which, under § 168.-120(2),[1] lodged the matter in the Circuit Court for review under Chapter 536; a full transcript of the hearing record was filed in the Circuit Court. The decision of the Board was affirmed, with allowance of salary (by amendment) to January 13, 1972. From that judgment Saunders has appealed to this Court. We accept juris-

---

1. All statutory references are to RSMo 1969, V.A.M.S.

diction because of constitutional questions raised in the trial court and here.

Some facts leading up to the formal hearing should be stated. On December 21, 1971, the Superintendent of Schools, Thurman L. Willett, wrote Saunders that he was suspended upon recommendation of Mr. Livingston, Director of the School, because of Saunders' refusal to discuss with the Director "the problems" occurring in Saunders' Communications classes; it was stated that the suspension, without pay, would continue until Saunders talked with Mr. Livingston "and/or" the Board of Education. On January 12, 1972, Mr. Hearne, as attorney for Saunders, wrote Mr. Willett stating that the suspension was illegal and requesting immediate reinstatement; in that letter Mr. Hearne stated that he was (by copy of the letter) suggesting to Saunders that he report back for work immediately. On January 13, 1972, Mr. Inglish, attorney for the Board (in Willett's presence), told Hearne by phone, Saunders being present with Hearne, that Saunders could return to work, since Mr. Willett did not have authority to suspend him; and Mr. Inglish, on the phone, heard Mr. Hearne give Saunders that message, and tell him also that if he did not go back "they will get you for unreasonable absence from duty." Further discussion was had regarding the date for a meeting. On January 14, 1972, Saunders wrote Mr. Willett stating the letter to be his "official request" to return to work immediately, and to meet with Mr. Willett in the presence of Mr. Hearne. Mr. Hearne testified that in a later phone conversation he told Mr. Inglish that Saunders would like written authority for his return, and that, as he understood it, Mr. Inglish "seemed to agree," or indicated that "it could be done"; Mr. Inglish stated that he had no recollection of any such conversation on his part, and never intended to promise written authority. A meeting or meetings were held but they developed nothing but further arguments; Saunders did not appear before the Board as later requested, but sent his attorney, who contended that no such Board meeting was legal. On March 2, Saunders was sent a warning letter under § 168.116, with specifications of possible charges, and a request that he meet with Mr. Willett's designated representatives on March 7, 1972, in an effort to "resolve" the matter, and that otherwise charges would be filed. This resulted in nothing and on May 18, 1972, charges were filed before the Board, a hearing was set (and re-set at Saunder's request), and due notice was given. The charges were, in substance: that Saunders had failed and refused to instruct the curriculum as directed; that he had refused to discuss the teaching of the curriculum with his superiors; that he had given the students of a second year class their choice of repeating the first year material or having the subject taught as he (Saunders) wanted to; that he refused to participate in the preparation of a course outline; that his refusal to return to work was unreasonable, and he was guilty of excessive and unreasonable absence; that he refused to discuss teacher evaluations with his superiors; that he was inefficient as shown by the evaluation reports; that he failed and refused to use the required textbooks in his teachings; that he was thus guilty of incompetency, inefficiency and insubordination in the line of duty. Another charge was added to the effect that he had taken part in the management of a campaign for the "election or defeat" of a member of the Board of Education in that he himself was a candidate. We do not elaborate on this, as it is not material to our decision. Saunders' contract was terminated as of January 13, 1972.

The hearings before the Board (conducted by counsel) were lengthy, consisting of several long evening sessions from June 13 to June 21, 1972, and consuming 553 pages of the transcript. It will only be possible to state a bare outline of what the substantive evidence showed. "Linn-Tech," as it is called, is a school devoted to two years of technical education, with the objective of putting its students "in industry," and not of furnishing a classical education. The students are high school graduates and

some have had college work. The English courses were a "supporting" area, concerned with furnishing a knowledge of technical words and phrases and the ability to converse and make a suitable presentation in the chosen . field. The school, through Mr. Symmonds, had prepared a textbook for each year of the English courses, following the lines of endeavor already suggested. It contained various word-lists from the various technical fields (acquired from all the major departments), and other pertinent materials. Saunders was offered an opportunity to help compile the book with extra compensation for summer work, but he declined. A calendar was prepared for the teaching of communications in each separate year, with designated subjects and times; this was deemed necessary to coordinate the work of the several teachers; Saunders "sat in" on the preparation of this. All teachers, and specifically Saunders, were instructed to follow the calendar and particularly to use the text and its lists of technical words. It is shown by very substantial evidence that Saunders repeatedly refused to use the word-lists from the text and failed to follow the calendar except perhaps partially in the first year classes. Instead of the prescribed word-lists he used "glossary" pages of miscellaneous words from a High School English text,—much like dictionary pages. These were used from year to year, handed out weekly, with the requirement that the students learn them; tests were given on such lists. Repeated objections to this were made by his superiors, with instructions to stop the practice, and many students complained that they were not getting the instruction which they wanted. Mr. Willett thought that the use of these glossary lists was "ridiculous," but left the matter to Padberg and Livingston; Saunders gave out book-lists for supplemental reading, of extremely broad scope, and very lengthy. Repeatedly, Mr. Padberg, the Curriculum Co-Ordinator, and Mr. Livingston, the Director of the School, attempted to talk with Saunders regarding his teaching practices; the evidence fairly

shows that he failed and refused on many occasions to discuss these matters with them unless Mr. Willett, the Superintendent of Schools was present. For a considerable time Mr. Willett would "come down" as requested but, as he said, he finally got tired of refereeing the fights and quit. Saunders seemed to distrust the others. These things had been going on for several years. Mr. Willett felt that Saunders was insubordinate in not "accepting his superiors." He told Saunders that he was capable but was "too lazy and stubborn." The evidence of those in authority was that, while supplementary reading and glossary word-lists might be desirable for a general education, there simply was not sufficient time to use them in these classes and still cover the prescribed material; and that their use by Saunders replaced the essential material. Saunders refused to discuss with Padberg the "teacher evaluations" and told him that he would see him in "a court of law." There was evidence that in one conference he called Mr. Livingston a "liar."

The evidence for Saunders was largely his own. Two students confirmed his use of the general (glossary) word-lists extensively, Saunders having them learn "every word"; but they said that he also had *some* spelling and pronunciation of technical words from technical lists. Saunders' testimony was, in substance, as follows: that he used various "Great Books," magazines, etc., for contemporary reading; that he frequently met with the faculty and others and offered his views; that he "eased out" of the second year calendar because he preferred the first year; that he frequently insisted that Mr. Willett be present at conferences with him, because Mr. Willett was "honest" and the others "changed things" after a conference was concluded; that he was told at times that he could have "free rein" in his classes, but that Padberg and others still insisted that he follow the calendar and the technical word-lists from the text; that he did not specifically call Padberg and Livingston "liars" but did so indicate by equivalent

words; that he used the glossaries for extra credit; that when Mr. Willett told him that he was alienating the students with these word-lists, it "irked" him, although he admitted that various students disapproved; that the students brought in some lists of a few technical words, and these were used for spelling and pronunciation; that he got the calendar late; that he felt that he should not be "tied down," and said "I don't like to be bound"; that, generally, he taught the calendar; that he did refuse to discuss the teacher evaluations, and invited Padberg to discuss them in "a court of law"; that he demanded written authority to return to work because he would not "endorse" the suspension and did not want to be embarrassed before the students; that he never offered to return to work after the suspension; that he did not receive a memo from Mr. Willett regarding his use of the vocabulary words; that the coerciveness "irritated" him and that he was also irritated by the fact that the school wrote its own textbook; that he was offered $1,000 for summer work on the book, but declined it.

The Board found, aside from the formal status findings, that: Saunders had failed and refused to instruct the curriculum as requested; that he had refused to discuss the curriculum and its teaching with his superiors; that he gave one second year class a choice as to whether he should teach the first year material again or "teach the subject matter as he wanted to"; that he refused to participate in the preparation of the course outline; that he refused to discuss the teacher evaluations with his superiors; that he had been inefficient as shown by the evaluation reports; that he had failed and refused to use the required textbooks in his teaching; that on January 13, 1972, he was told through his attorney that he could return to work immediately, that his refusal to do so was unreasonable, and that he had been guilty of excessive and unreasonable absence; that by reason of all the foregoing he had been guilty of incompetency, inefficiency and insubordination in the line of duty. A finding was added to the effect that he had violated the provisions of Section 168.130 by taking part in the management of a campaign for a School Board election. That is not material in the view we take of this case. The decision of the Board was that Saunders' contract be terminated effective January 13, 1972.

Sections 168.114 and 168.116 provide that the contract of a permanent teacher may be terminated upon written charges, after due notice and a hearing (if requested), for incompetency, inefficiency or insubordination in line of duty; also, that the Board may suspend the teacher pending a decision but that his salary shall be continued during the suspension. There is no objection here to the notice, or to the time or procedure of the hearing. We hold that, upon the evidence as herein recited, the Board could reasonably find that Saunders had been guilty of inefficiency (because of the manner of his teaching) and of insubordination. We note that § 168.-114 also specifically provides that the Board may consider "evaluation reports" prepared by the school, and that Saunders refused even to discuss these with one or more of his superiors.

We hold that there was no legal obligation upon respondent to notify Saunders in writing that he might return to his duties, and that the oral notice concededly given to him by Mr. Inglish was sufficient. Essentially, that notice cancelled the suspension. No authority whatever has been cited to the contrary.

Appellant's points are, in substance: that under the evidence the actions of the School Administration infringed upon and unduly restricted his right of freedom of speech and expression (1st and 14th Amendments, U.S. Constitution); that the limitations imposed upon him and not upon others were arbitrary and unreasonable and denied him equal protection (14th Amendment); that the weight of the evidence shows a denial of due process (14th Amendment) in that the Board was not

impartial and that it failed to state evidence supporting its findings; that there is no substantial evidence to support the judgment, and that it is based on speculation; that there was no evidence that appellant "managed a campaign" and even if so the finding would be violative of his right of free speech, assembly and petition; and that in any event appellant is entitled to his salary to August 8, 1972, the date of termination of his contract.

1. *The Right of Free Speech.* In Keyishian v. Board of Regents of the University of the State of New York, 385 U.S. 589, 87 S.Ct. 675, 17 L.Ed.2d 629 (1967), cited by appellant, a complex of statutes, university regulations, etc., made membership in any subversive organization, seditious utterances, or the advocating of the forceful overthrow of the government, a ground for dismissal. The court (with four Justices dissenting) held that the statutes and regulations were too vague and "over-broad"; the references to "academic freedom" were made with reference to the teacher's right to a discussion and exchange of political beliefs, in the absence of any participation by him in prohibited activities; and the opinion did not in fact deal with any freedom of teaching, as such, in the classroom. Appellant has cited that case, and the next one we mention, as showing that teachers and other public employees are entitled to the same constitutional rights as other members of the public. That may be true, but the cases have no applicability to our situation.

In Meyer v. Nebraska, 262 U.S. 390, 43 S.Ct. 625, 67 L.Ed. 1042 (1923), the Court held invalid a Nebraska statute prohibiting the teaching of any foreign language in the first eight grades of any school. The defendant had so taught German in a parochial school. The Court held that the concept of "liberty" under the 14th Amendment included the right of an individual to freedom of occupation, to acquire and dispense knowledge, and to worship God in one's own way; and that this included the right of defendant to teach German and the right of the parents to have it taught; further, that the statute had no reasonable relation to any legitimate state purpose, but that the state did have the power to prescribe a curriculum for its schools. That case was concerned only with 14th Amendment "liberty" and not with freedom of speech. Obviously, the subject taught was included in the school curriculum; and the thrust of the decision seems to be not that there is an unlimited freedom to teach, but that the *state* may not interfere in the teaching process as prescribed by the schools without some relationship to a justifiable state goal.

Barenblatt v. United States, 360 U.S. 109, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959) is cited only for the statement that the courts are alert to prevent intrusions upon academic freedom; but the Court there further held that such 1st Amendment rights may be overbalanced by the public interest and that a teacher was subject to interrogation as to his membership in the Communist Party.

In Tinker et al. v. Des Moines Independent Community School District, 393 U.S. 503, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969), the right of three pupils peacefully to wear black arm bands protesting the Vietnam war was upheld, as a First Amendment right of expression of opinion. In Epperson et al. v. Arkansas, 393 U.S. 97, 89 S. Ct. 266, 21 L.Ed.2d 228 (1968), a statute prohibited the teaching of evolution; the school put out a textbook which explained the theory. The statute was held invalid as tending to establish a religion. The Court seems to have avoided the free-speech issue, and, for that matter, the textbook required the explanation of evolution. The teacher had merely sought a declaratory judgment. Wieman et al. v. Updegraff et al., 344 U.S. 183, 73 S.Ct. 215, 97 L.Ed. 216 (1952), involved the requirement of a loyalty oath; it and Keefe v. Geanakos et al., 418 F.2d 359 (CA 1) (1969) are cited only on the general principle of academic freedom.

While some of the above cases refer generally to the attitude of the courts in encouraging the exchange of ideas and views in the classrooms, the protection of "academic freedom" in the abstract, and the right to belong to sundry organizations, none of them involves facts such as we have in the present case. The courts may not usurp the discretionary powers of a School Board, Johnson et al. v. Branch, (CA 4), 364 F.2d 177, at loc. cit. 181 (1966); Doherty v. Wilson et al., 356 F. Supp. 35 (D.C.Ga.1973), and no one denies the power of a School Administration to establish a curriculum and require its use; nor do any of the authorities justify the action of a teacher in rejecting in whole or in part the curriculum and calendar established by the School Administration. School authorities are vested with wide discretion in all matters affecting school management, and a court may not ordinarily interfere unless the power is exercised in an arbitrary, unreasonable or unlawful manner. Brooks v. School District of City of Moberly et al. (CA 8), 267 F.2d 733 (1959); Long v. Board of Education of City of St. Louis (CA 8), 456 F.2d 1058 (1972). In Calvin v. Rupp (CA 8), 471 F. 2d 1346 (1973), the Court upheld the failure to renew a teacher's contract because of his inability and failure to conform his "professional techniques" to the schedule prescribed by the "chain of command," and found no constitutional violations.

We are impelled to conclude that the Board, in terminating Saunders' contract, did not infringe upon his constitutional right of freedom of speech and expression.

2. *Equal Protection.* Saunders claims that limitations and requirements placed upon him and not upon other teachers, were discriminatory, arbitrary and unreasonable. He obviously refers to the directions that he follow the curriculum and calendar, that he use the technical word-lists, and that, supposedly, he not use optional materials. The only evidence of any other English teacher's methods came from Dr. Bloom. The matter does not really rise to the stature of a constitutional question but we discuss it briefly. Saunders was told at times that he might use optional reading lists and wordlists *if* he covered all of the assigned and required material shown in the textbook and the calendar. It was obvious, over the years, as shown by very substantial evidence, that he was *not* doing so. Hence, the directions to him were to eliminate the "optional" material, insofar as it interfered with the prescribed instruction; and the evidence further shows that he did not do so. We do not intend to extend this opinion with a discussion of what Dr. Bloom did in her classes. Her testimony was that she taught all of the prescribed material, and there is no substantial evidence that Saunders was treated any differently than was any other teacher, including Dr. Bloom. Such things are matters clearly within the jurisdiction of the school authorities, and there is no evidence here of anything which should justify the interference of a court. The case of Trister v. University of Mississippi (CA 5), 420 F.2d 499 (1969), is inapplicable on its facts; it concerned the allowance of outside activities and practice by law school teachers, and had nothing to do with any matter of substantive teaching or curriculum. It did hold that the University could not arbitrarily restrain the plaintiffs from a certain governmental type of outside practice, while permitting, generally, outside law practice by the others. It seems clear that a racial basis was involved.

Counsel protests that certain evidence and an offer of proof were improperly excluded; we do not deem the subjects involved to have been of sufficient relevancy to justify any action here, which would presumably require a reversal and remand to the Board. The equal protection point is denied. The evidence does not sustain any such claim.

3. *Denial of Due Process.* Appellant says that the Board was not an "Impartial De-

cision Maker," that he was denied due process, and that in its decision the Board failed to state evidence supporting its findings. He cites Goldberg v. Kelly et al., 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970) as holding, in a proceeding involving the denial of public assistance, that due process requires an impartial decision maker, and a decision stating the reasons for the termination of benefits and indicating the evidence relied on. The Court there did not hold that findings or conclusions were necessary. There were vigorous dissents in that case. Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972), also cited, held that a nontenured teacher was entitled to a hearing before renewal of his teaching contract was refused, primarily to see if he had any implied or de facto property right. The case of Board of Registration of the Healing Arts v. Masters, 512 S.W.2d 150 (Mo.App. 1974), also cited, is only of value in its holding that a physician whose right to practice is being considered, is entitled to notice and a hearing before the Board, with opportunity to prepare his case, the right to present evidence and cross-examine, and with counsel if desired. The opinion cited Goldberg, supra. The Court held that there had been no denial of due process in the hearing, as held.

■ Appellant insists that the School Board here had prejudged his case, that it was hostile to him, and that there could not have been any impartial decision. We have carefully read the complete record. One member, Mr. Mantle, got into more or less of an argument with Saunders, primarily over the latter's candidacy for the School Board, and indicated an inclination that he should have been discharged for prior derelictions. The other five members maintained a fair and rather commendable attitude, in view of the evidence of Saunders' insubordination, arguments with superiors, etc. Mr. Mantle was only one member out of six, and we cannot assume that he controlled the Board or any one but himself. Moreover, it is very late now to

raise the question of prejudice; our statutes provide only for a hearing before the School Board (§ 168.116) with the right of appeal to the Circuit Court (§ 168.120). The Circuit Court has considered this matter upon the entire record, and has overruled a motion for new trial containing this same contention. We have no inclination to overturn its decision at this late date. In Mitchell v. City of Springfield, 410 S.W.2d 585 (Mo.App.1966), a similar claim of prejudice was made; the Court held that there is a strong presumption in favor of the validity of an administrative determination and that clear and convincing evidence is required to overcome it; also that the Court may not assume that such a body was improperly influenced. The cases cited (above) by appellant on indicated matters of general principle should not affect the soundness of that opinion, especially in the respects just noted.

■ The Board as a whole acted fairly and well within its discretionary powers. So far as concerns the failure of the Board to set out the precise evidence upon which it relied,—this would have been virtually impossible. We hold that the findings themselves constitute a sufficient reference to the substance of the intolerably lengthy evidence; indeed, they constitute an almost complete resume of the evidence which the Board believed and upon which it relied; it certainly was not necessary to name the witnesses. This point is denied.

■ 4. *Substantiality of Evidence.* This contention is that there was no substantial evidence to support the Board's decision. More specifically, appellant says that the testimony of each of the Board's witnesses was "self-contradictory and confusing," and that the resulting decision was based upon speculation and surmise. We have, with some effort, set out the substance of all the testimony. No doubt remains in our minds that the evidence on behalf of the Board was substantial. We shall not review it again. We have found no substantial contradictions or confusion.

Mere minor contradictions or confusion in the testimony of a witness do not require that the evidence be disregarded, but the credibility and meaning of it is for the trier of fact. To require the contrary, the testimony must contain such diametrically opposed statements on a vital question as to rob it of all probative value and conclusively show that the witness testified untruthfully, one way or the other. Boehm v. St. Louis Public Service Co., 368 S.W.2d 361 (Mo.1963). The opinion in Merideth v. Board of Education of Rockford R–6 School District, 513 S.W.2d 740 (Mo.App. 1974) discloses facts and controversies in the evidence analogous to these here. The Court noted in detail the rules applicable to the review of the school board decisions such as we have here. So considered, the decision of the Respondent Board was rightly affirmed, for there was ample, competent and substantial evidence to sustain it.

5. *The Management of a Campaign.* This point attacks the Board's finding that Saunders took part "in the management of a campaign," for the election of a member of the School Board and that this violated § 168.130. We have already indicated that we consider that part of the Board's findings as not necessary to our decision; the other findings are sufficient to sustain the order of termination. Hence, we do not discuss this point.

6. *The Salary Question.* Lastly, appellant says that in any event he is entitled to his pay up to the date of his termination, August 8, 1972. The statute, § 168.116(4), provides that the Board may suspend a teacher's contract, but that his pay shall be continued until the final action of the Board. That statute is inapplicable here, for the Board never suspended Saunders. We have already indicated that the suspension was cancelled, that a written notification that he might return to work was not necessary and that no authority whatever has been cited to the contrary. Consequently, when Saunders was notified, on January 13, 1972, that he might return he should have presented himself for work. Not having done so, the ordinary rules of contract law apply, specifically, that one who wishes to enforce a contract against the other party must himself perform or tender performance. This is horn-book law. Saunders did not do so, and he is not entitled to any salary after the time of the oral notice. If there were any school days intervening between the dates of his supposed suspension and the oral notice to return, he should be paid for those, and the judgment of the trial court would include these. He is not entitled to payment of salary thereafter. The Board did not terminate the salary for the period after January 13, 1972; Mr. Saunders did it by his own actions. The Board found that his refusal to return to work, after notice that he might do so immediately, was unreasonable. Various elements may well have entered into that finding as, for instance, a belief that his failure to enter into further good faith negotiations with the school authorities for the resolution of the difficulties, was unreasonable. We agree with the finding.

Finding no reversible error, the judgment is affirmed.

PER CURIAM:

The foregoing opinion by HENRY I. EAGER, Special Commissioner, is adopted as the opinion of the Court.

All of the Judges concur.