[No. 45771. En Banc. May 15, 1980.]

GORDON W. MILLIKAN, ET AL, *Petitioners,* v. BOARD OF DIRECTORS OF EVERETT SCHOOL DISTRICT NO. 2, ET AL, *Respondents.*

*Cogdill, Deno & Millikan* and *Kent Millikan,* for petitioners.

*Perkins, Coie, Stone, Olsen & Williams, Bruce D. Corker,* and *John Binns,* for respondents.

*Judith Lonnquist* on behalf of Washington Education Association, amicus curiae.

WRIGHT, J.—This is an action by two high school teachers who claim their First Amendment rights have been abridged because they are not allowed to team–teach a

course according to their own plan. Defendant–respondent school board prevailed on summary judgment. The Court of Appeals dismissed the appeal for lack of an adequate record. *Millikan v. Board of Directors,* 20 Wn. App. 157, 579 P.2d 384 (1978). We reversed the Court of Appeals, remanded the matter to the trial court for supplementation of the record, and retained the case for a decision on the merits. *Millikan v. Board of Directors,* 92 Wn.2d 213, 595 P.2d 533 (1979).

Petitioners Gordon Millikan and Robert Petersen developed a method of teaching history known as "Global Studies," in which the class is divided into small groups to work with two teachers. Individual study, research and writing projects for each student are stressed.[1]

In 1973 a group of teachers, including petitioners, requested that a pilot program be instituted for the teaching of Global Studies as an alternative to a more conventional history course. The school district approved and implemented the pilot program. Subsequently, however, students were given a choice between conventional history and Global Studies. A vast majority chose the more conventional course, which resulted in fewer Global Studies classes. During the 1976 spring semester, Millikan was assigned to teach one traditional history class and four Global Studies classes. As a consequence of the student–preference registration the Global Studies program for the 1976 fall semester was reduced to one class. Millikan was required to teach his other four history classes in the conventional manner.

In the spring of 1976, Robert Petersen was transferred from his team–teaching assignment with Millikan to the science laboratory. Petersen alleges the new assignment was intended to destroy Global Studies and to retaliate against

---

[1] Students enrolled in Global Studies courses receive credit for the state curriculum requirements for world history or American history and government.

Global Studies is described on pages 529 and 532, *infra.* For a description of the "team–teaching" technique, see *Francisco v. Board of Directors,* 85 Wn.2d 575, 537 P.2d 789 (1975).

him for joining Millikan in the filing of a grievance regarding the student registration procedure.

Following adverse decisions at all levels of the grievance process, Millikan and Petersen appealed to the Superior Court pursuant to RCW 28A.88.010 and RCW 28A.88.015, which provide for de novo review of school board decisions, and RCW 28A.58.460–.480. In granting summary judgment for the school board, the trial court concluded it was being asked to review administrative matters. It held the decision to offer particular courses and to allow student preference in the selection of courses was the prerogative of the school board. The court also found there had been no First Amendment violation.

Millikan and Petersen contend the trial court erred by granting the summary judgment, asserting the school district is not entitled to judgment as a matter of law and that there is a genuine issue of material fact. This issue raises three questions: (1) Do the restrictions imposed on petitioners' teaching violate their right to academic freedom? (2) Does the reassignment of Petersen abridge his First Amendment rights as a retaliation for filing a grievance? (3) Does the school district violate petitioners' right to equal protection by subjecting their course to student preference registration?

## ACADEMIC FREEDOM

Petitioners argue the restrictions imposed upon their team–teaching methods and the requirement that they teach in the conventional manner violate their right to academic freedom. They assert that case law recognizes the right of a teacher to select teaching methods and materials. On the other hand, the school board asserts that a teacher has no right to select or use teaching methods or course materials contrary to administrative instructions.

The Supreme Court has long recognized that academic freedom at the college level is protected under the First Amendment. It only recently extended that protection to the noncollegiate level, however. In *Tinker v. Des Moines*

*Independent Community School Dist.* 393 U.S. 503, 21 L. Ed. 2d 731, 89 S. Ct. 733 (1969), the court found unconstitutional a ban on student black armbands worn to protest the Vietnam war. The court stated:

First Amendment rights, applied in light of the special characteristics of the school environment, are available to teachers and students. It can hardly be argued that either students or teachers shed their constitutional rights to freedom of speech or expression at the schoolhouse gate.

393 U.S. at 506.

Millikan and Petersen rely on a number of cases purportedly recognizing a teacher's substantive right to select teaching methods and materials. *Sterzing v. Fort Bend Independent School Dist.*, 376 F. Supp. 657 (S.D. Tex. 1972), *remanded for reconsideration of relief granted*, 496 F.2d 92 (5th Cir. 1974); *Mailloux v. Kiley*, 323 F. Supp. 1387 (D. Mass. 1971), *aff'd*, 448 F.2d 1242 (1st Cir. 1971); *Parducci v. Rutland*, 316 F. Supp. 352 (M.D. Ala. 1970); *Keefe v. Geanakos*, 418 F.2d 359 (1st Cir. 1969). All of these cases involve discharge or suspension stemming from a high school teacher either having provided materials with a controversial content or making allegedly profane or objectionable remarks to students. In each case, the court was attempting to protect both the right of the teacher, as speaker, and the right of the student to receive the communication. These cases are not in point, however. Here the students have expressly indicated they do not wish to participate in the Global Studies course. Petitioners' case is undercut because the right they assert is independent from the students' rights.

Furthermore, in each of the above cited cases the court found a due process violation because the teaching method had not been proscribed before the nonretention or firing. Since these factors are not present in the instant case the value of those cases is questionable as precedent for a teacher's right to choose materials and methods. *See, e.g., Mailloux v. Kiley*, 323 F. Supp. 1387, 1393 (suspension may

be in order where teacher with notice uses a disapproved method not appropriate to teaching the subject).

As noted above, controversial statements and methods of conveying a point underlie the cases cited by petitioners. In the case at bar, however, the content of specific communications is not actually involved. At most, the effect of the student preference registration system is to force Millikan to teach courses in a more conventional manner. He acknowledges that neither his specific course material nor his technique have been disapproved. Instead, only a broad methodology and course approach has, in effect, been forbidden. Arguably, judicial nonintervention is called for. This conflict does not "directly and sharply implicate basic constitutional values." *Epperson v. Arkansas,* 393 U.S. 97, 104, 21 L. Ed. 2d 228, 89 S. Ct. 266 (1968). But because of the novelty and importance of the question, we will directly confront the academic freedom issue.

■ The applicable cases take the position that a school district has authority to prescribe both course content and teaching methods. *Adams v. Campbell County School Dist.,* 511 F.2d 1242 (10th Cir. 1975); *Saunders v. Reorganized School Dist. 2,* 520 S.W.2d 29 (Mo. 1975); *Hetrick v. Martin,* 480 F.2d 705 (6th Cir.), *cert. denied,* 414 U.S. 1075, 38 L. Ed. 2d 482, 94 S. Ct. 592 (1973); *Clark v. Holmes,* 474 F.2d 928 (7th Cir. 1972), *cert. denied,* 411 U.S. 972, 36 L. Ed. 2d 695, 93 S. Ct. 2148 (1973).

In *Hetrick,* a First Amendment challenge to contract nonrenewal, the school administration expected teachers to teach on a basic level, stressing fundamentals and and following conventional teaching patterns. Plaintiff's teaching, however, emphasized student responsibility, as well as freedom to organize class time and assignments in terms of student interest. In an unpublished memorandum opinion, the Federal District Court for the Eastern District of Kentucky reasoned that while the First Amendment guaranty of academic freedom gives a teacher the right to encourage a vigorous exchange of ideas within the confines of the subject matter being taught,

it does not require a University or school to tolerate any manner of teaching method the teacher may choose to employ. A University has a right to require some conformity with whatever teaching methods are acceptable to it.

480 F.2d at 707.

On appeal, the teacher claimed a constitutional right to "teach her students to think" and argued the First Amendment protected her from termination for using teaching methods and adhering to a teaching philosophy that are "well–recognized in the profession." The Sixth Circuit Court of Appeals concluded plaintiff's rights had not been abridged by the refusal to rehire her because of her teaching philosophy. The court held academic freedom

does not encompass the right of a nontenured teacher to have her teaching style insulated from review by her superiors . . . just because her methods and philosophy are considered acceptable somewhere within the teaching profession.

480 F.2d at 709.

Like the plaintiff in *Hetrick,* Millikan and Petersen have utilized unconventional but professionally recognized methods designed to teach the student to think. Notwithstanding this worthy objective, *Hetrick* indicates an educational institution may require some conformity in teaching methods. Under the reasoning in *Hetrick,* the respondent–defendant board's requirement that petitioners teach history classes in a conventional manner contrary to their own preferred teaching philosophy is not violative of their rights.

In a similar vein, *see Adams v. Campbell County School Dist., supra,* in which nontenured high school teachers sued the school district following nonrenewal of their employment contracts. That court concluded that even though the teachers' methods may have had educational value, plaintiffs did not have an absolute constitutional right to use those methods in preference to more orthodox ones. *See also Clark v. Holmes, supra,* and *Saunders v. Reorganized*

*School Dist. 2, supra,* which held the school board need not tolerate a significant deviation from prescribed course content or the course calendar.

Accordingly, if Global Studies detracts from the scope of a conventional history course—because it emphasizes small groups, independent reading and writing, and inquiry–discovery techniques—petitioners may be compelled to abandon their own preferred techniques and to teach history in a more conventional manner. While teachers should have some measure of freedom in teaching techniques employed, they may not ignore or omit essential course material or disregard the course calendar.

Millikan and Petersen characterize this controversy as one involving the right to choose a teaching method. Yet, Petersen's own affidavit stresses that unless the school district is enjoined "there will be a tremendous loss of *coverage and content.*" (Italics ours.) Paul G. Treckeme, supervisor of secondary social studies, states in his affidavit that Global Studies is "significantly different both in *subject matter content and teaching methodology*" from the traditional survey course. (Italics ours.) Further, a University of Washington professor familiar with Global Studies characterizes it as differing from the conventional history course as much as "new math" differs from traditional math. Consequently, it is clear Global Studies differs from the more conventional course of study in more than teaching method—it differs in coverage and content as well.

Since significant course content differences exist and course content is manifestly a matter within the board's discretion,[2] petitioners' claims of academic freedom are not

---

[2]RCW 28A.58.758(1) gives each common school district board of directors final responsibility for setting policies "ensuring quality in the content and extent of its educational program". Paragraphs (a) and (e), section (2) of RCW 28A.58.758 charge the board, acting through its administrative staff, with establishment of "performance criteria and an evaluation process . . . for all programs constituting a part of such district's curriculum" and establishment of "final curriculum

well taken.[3]

Millikan and Petersen also assert the school board's actions violate their contractual right to academic freedom guaranteed by article III, section 3 of the Everett School District 1975–76 Handbook. It reads:

> *General Statement*
> Education can best be carried out in an atmosphere in which academic freedom for staff is encouraged and guaranteed with due consideration to the rights of the students and community in connection therewith.
> *Suggested Procedures for Handling Complaints.*
> The right of community involvement in matters or issues relating to academic freedom is herein recognized. It is recommended that citizen complaints relevant to academic freedom follow this procedure:

In support of their secondary position petitioners cite *In re Department of Educ., State of Hawaii and Hawaii State Teachers Ass'n,* 66 Lab. Arb. 1221 (1976) (Tsukiyama, Arb.), a case based primarily on the need to foster and preserve the students' right to hear and learn even controversial subjects and issues. The Hawaii decision is inapposite, however. Here, students' right to hear and learn are not

---

standards" consistent with statutes and regulations of the State Board of Education.

RCW 28A.58.760(2)(a) provides it is the responsibility of the certified teaching and administrative staff to implement the district's prescribed curriculum. Failure to do so constitutes cause for discharge.

RCW 28A.59.180(5) empowers the boards of directors of first-class districts to prescribe a course of study consistent with that prepared by the State Board of Education. *And see* RCW 28A.58.090 (school boards accountable for education offered to district students) and RCW 28A.58.754(1)(e) (school districts have sole authority to designate portion of high school curriculum).

[3]The logical extension of petitioners' argument was well stated by the board's counsel in oral argument:

"If the plaintiff–appellants are correct in their analysis . . . [i]f the district wanted to have new math they would not be able to do it because the teacher who wanted to teach traditional math would have [the right] to do it . . . [I]f you accept plaintiff's theory, a district would be completely unable at any time to direct teaching methods . . . it would be completely unable to keep control of its curriculum."

directly involved. The contract provision in question—which clearly contemplates complaints over books and other controversial materials—does not support the teachers' position that being assigned to teach conventional history courses violates their right to academic freedom.

## PETERSEN'S REASSIGNMENT

Petitioners next contend Petersen's reassignment violates his First Amendment rights of free speech and academic freedom. They argue the reassignment cannot stand if it was employed to moot his grievance, retaliate for his grievance, or to infringe on the exercise of his right to academic freedom.

First, as indicated previously, Petersen has no right to teach Global Studies. The contention a school administration is required to perpetuate a program of "team–teaching" is not well taken. The allegation Petersen was reassigned as punishment for filing a grievance merits closer examination, however.[4] The Cascade High School principal said the reassignment was "not related to the [student preference] procedures recommended by Mr. Treckeme." Petersen claims the principal would not explain the reassignment. Petersen's affidavit states:

> There were other certified staff that could have been assigned to that science lab without any problem, and also a teacher's aid was available to cover the science lab assignment. On checking the schedule I found at least two other periods where certified staff were not assigned to cover periods in the science lab. During this period only two or three students at most would come into the learning center . . . I also checked with the science department supervisor . . . and was informed that the change in assignment which I requested could have been made with no disruption of any program.

[4]It is doubtful Petersen seriously relies upon this argument. Petersen's affidavit states the reassignment was "possibly" to retaliate for filing the grievance. Petitioners' counsel said in oral argument Petersen was reassigned "for the *sole* reason of scuttling these courses and making it more difficult to teach them." (Italics ours.) When asked whether Petersen was abandoning the retaliation claim, however, petitioners' counsel assured the court his client was not dropping the argument.

On the other hand, Petersen, a forestry teacher, does not perform a teaching function at the 1–period lab so the assignment is not incompatible with his educational background. Further, since each teacher ordinarily receives a 1–period nonacademic assignment, it is not unreasonable for the administration to require Petersen to supervise students in the laboratory.

■ In ruling on a motion for summary judgment, the court must consider the material evidence and all reasonable inferences therefrom in favor of the nonmoving party. If reasonable persons might reach different conclusions the motion should be denied. *Novenson v. Spokane Culvert & Fabricating Co.,* 91 Wn.2d 550, 552, 588 P.2d 1174 (1979); *Balise v. Underwood,* 62 Wn.2d 195, 199, 381 P.2d 966 (1963). We do not believe a person would conclude the reassignment resulted from the filing of the grievance. Summary judgment on this issue was proper.

### EQUAL PROTECTION

■ Finally, Millikan and Petersen argue the school district violates their rights to equal protection by subjecting their Global Studies program to student preference registration while not subjecting other courses to the same procedure. They urge there is no difference between Global Studies and the traditional course justifying the different treatment. As we have stated previously, differences—in content, coverage and teaching approach—justify the disparate treatment.

The notice of appeal and complaint by which petitioners initiated this action allege Global Studies involves a "particular teaching methodology and subject matter content." Further, the fact petitioners requested a pilot course shows Global Studies is considered significantly different from a conventional history course. The request states the purpose is to enable teachers to arrange "team–teaching . . . and teaching techniques new to them." The course utilizes techniques of inquiry–discovery and small groups. Study–writing exercise for 2–week periods are common.

In short, the record refutes Millikan's contention that the differences are no more significant than the differences in style, methods and content used in conventional history courses taught by other teachers. Substantial differences clearly exist between Global Studies and conventional history courses. Consequently, a summary judgment in favor of the school board was warranted.

The judgment of the trial court dismissing petitioners' action is affirmed.[5]

UTTER, C.J., and ROSELLINI, STAFFORD, BRACHTENBACH, HOROWITZ, DOLLIVER, HICKS, and WILLIAMS, JJ., concur.

---

[5]We do not express an opinion on the desirability of the Global Studies teaching method. The record shows much to recommend the system and we certainly do not condemn it. The court, however, may not substitute its judgment about the merits of courses for that of the school authorities.