[No. 17110–1–I.   Division One.   July 6, 1987.]

DAVID MEYERS, INC., ET AL, *Appellants*, v. RALPH
ANDERSON, ET AL, *Respondents*.

*Ronald J. Meltzer* and *Sinsheimer & Meltzer, Inc.*, for
appellants.

*Barbara L. Holland* and *Garvey, Schubert, Adams &
Barer*, for respondents.

ANDERSEN, J.*—

FACTS OF CASE

Two real estate brokerage firms[1] appeal a summary judgment dismissing their action to recover a real estate brokerage commission and for tortious third party interference with a contractual relationship. We reverse and remand.

The owners[2] of the Butterworth Building located at 1921 First Avenue in Seattle gave the right of first refusal to purchase their building to a lessee[3] occupying three floors of their building under a 5–year lease. The lease provided in this regard as follows:

> *Sale of Butterworth Building.* If during the lease term hereof, Lessor receives an offer for the purchase of the Butterworth Building which it wishes to accept, it shall not do so without first giving Lessee written notice thereof stating the name of the purchaser and the purchase terms and conditions. Lessee shall have ten (10) days from the receipt of such notice within which to determine whether it wishes to purchase the building *at the same terms and conditions* and, if it does, to advise Lessor in writing thereof. If Lessee so elects to purchase the building and so timely advises Lessor thereof, the sale shall be closed within the time period provided in the third party's offer at an escrow agent satisfactory to Lessor, with Lessee paying all closing costs. If Lessee does not so timely elect to purchase, Lessor shall be free to sell the Building to the third party offeror on terms no less favorable than those contained in the notice to Lessee.

(Italics ours.)

---

*This appeal was heard by a Supreme Court Justice, a Superior Court Judge, and a retired Superior Court Judge sitting as Court of Appeals Judges Pro Tempore in Division One.

[1] David Meyers, Inc. and Landover Corporation, d/b/a William A. Bain Associates.

[2] Ralph Anderson and Jane Doe Anderson, his wife; Floyd R. Hanby and Jane Doe Hanby, his wife; and William Graves and Jane Doe Graves, his wife.

[3] Kramer, Chin & Mayo, Inc., a Washington corporation.

Beginning in March 1982, there were ongoing discussions between the building owners and the lessee on the possibility of the lessee buying the building. Then in June 1982, the owners entered into a written 90–day listing agreement with one of the brokers herein[4] whereby the owners agreed to pay the broker a 5 percent commission if the broker procured a purchaser for the building. A month later, on July 19, 1982, and apparently without reference to any sales activities by the broker, the lessee made a written offer to the owners to buy the building for $450,000. The owners did not accept this offer.

Then in October 1982, the original broker along with a cobroker[5] submitted a $600,000 offer for the building on behalf of Michael M. Fleming. This offer was by means of a signed earnest money agreement which also provided that the cobrokers would divide a 5 percent commission if and when a sale to Fleming closed. The owners signed their acceptance of this earnest money agreement on October 15, 1982. Shortly thereafter, however, the owners sold the building not to Fleming who had been procured by the brokers, but to the lessee, and not for the $600,000 offered by Fleming, but for a real sales price of $570,000. Thereupon the brokers brought this action.

One ultimate issue is determinative of this appeal.

## ISSUE

Did the lessee properly exercise its right of first refusal to purchase the building on the "same terms and conditions" as the third party offer where the lessee's offer to purchase did not include the brokerage commission that would have been payable under the terms of the third party offer?

## DECISION

CONCLUSION. Lessee's failure to include the amount of the brokerage commission in its offer to the owners precluded

---

[4]David Meyers, Inc.

[5]Landover Corporation, doing business as William A. Bain Associates.

its offer from constituting a proper exercise of its right of first refusal. To be effective, the exercise of the right of first refusal must ordinarily be the same in all material respects as the terms and conditions contained in a third party offer to purchase.

To determine the brokers' rights in this matter, we look to the terms of the earnest money agreement signed by the third party, Mr. Fleming (which was also signed on behalf of the brokers), and accepted in writing by the owners on October 15, 1982. This is because the Fleming agreement specifically provides that it "supercedes all agreements, both written and verbal, made prior to the date hereof" and "constitutes a complete agreement".[6]

All parties to the Fleming earnest money agreement were aware of the lessee's right of first refusal. The agreement recognized this and by its terms provided that the offer therein was subject to the lessee's refusal. The agreement also provided:

> In the event [the lessee] exercise[s] their first right of refusal and agree to purchase the property *under the terms and conditions recited herein,* then this offer shall become null and void and Purchaser [Fleming] and Sellers [owners] shall have no further obligation to each other.

(Italics ours.)

The validity of lease clauses giving lessees a first option privilege or purchase preference is well recognized in this state.[7] "A lease provision for a first option to purchase, or right of pre-emption or first refusal, imports a preferential right of the lessee to purchase the leased premises *at the same price and on the same terms* as contained in an offer from a third person acceptable to the lessor; . . ." (Italics

[6]*See Dix Steel Co. v. Miles Constr., Inc.,* 74 Wn.2d 114, 118–19, 443 P.2d 532 (1968); *Emrich v. Connell,* 105 Wn.2d 551, 555–56, 716 P.2d 863 (1986).

[7]*Superior Portland Cement, Inc. v. Pacific Coast Cement Co.,* 33 Wn.2d 169, 193, 205 P.2d 597 (1949).

ours.)[8] To be effective, a lessee's exercise of its right of first refusal cannot vary in any material respect from the third party's offer.[9]

Here, the lessee's lease gave it the right to elect to purchase the building on "the same terms and conditions" as those contained in the Fleming earnest money agreement. That earnest money agreement recognized this right and provided that if the lessee purchased the property "under the terms and conditions" of the earnest money agreement, the earnest money agreement would be null, void and not binding on the parties thereto. Had the lessee actually matched the $600,000 purchase price in the Fleming earnest money agreement, that would have been the end of the matter, and the brokers who procured the Fleming offer would not have been entitled to any commission. The lessee did not match that price, however. The lessee actually paid only $570,000, which the owners accepted.

■ As the record conclusively demonstrates, the owners and lessee simply got together, reduced the purchase price by the amount of the brokers' fee ($30,000), and consummated the sale of the building to the lessee. The owners then refused to pay the brokers' fee. This they claimed the right to do. We disagree. Although there is some authority to the contrary,[10] the view taken by the clear majority of jurisdictions is that recently summarized in 2 M. Friedman, *Leases* § 15.6, at 816 (2d ed. 1983):

Does a tenant meet an outside offer and agree to purchase "on the same terms" if he offers to pay the same

---

[8]51C C.J.S. *Landlord and Tenant* § 88(3), at 269 (1968). *Accord, Northwest Television Club, Inc. v. Gross Seattle, Inc.,* 96 Wn.2d 973, 980, 640 P.2d 710 (1981); *Bennett Veneer Factors, Inc. v. Brewer,* 73 Wn.2d 849, 856, 441 P.2d 128 (1968); *Matson v. Emory,* 36 Wn. App. 681, 683, 676 P.2d 1029 (1984); 49 Am. Jur. 2d *Landlord and Tenant* § 378, at 395 (1970).

[9]*Northwest Television,* at 980.

[10]*C. Robert Nattress & Assocs. v. CIDCO,* __ Cal. App. 3d __ , 229 Cal. Rptr. 33, 41–43 (1986); *Reef v. Bernstein,* __ Mass. App. Ct. __, 504 N.E.2d 374 (1987). *See Redfield v. Estate of Redfield,* 101 Nev. 24, 26, 692 P.2d 1294 (1985).

price, less the amount of a brokerage commission that would have been payable by the landlord on the sale to the third party? *Generally, tenant's deduction of the amount of a broker's commission precludes his offer from constituting a proper exercise of his first refusal.* (Footnote omitted. Italics ours.)[11]

The unfairness of any other rule is underscored by the facts of the case before us. Here, the most the lessee had offered to pay the owners before the brokers procured the $600,000 Fleming offer was $450,000. Then after the Fleming offer was obtained, lessee increased its actual offer to $570,000, that being the amount of the Fleming offer less the $30,000 brokers' commission. Thus, the brokers' efforts resulted in the owners getting $120,000 more for their property from the lessee than the lessee's offer would have netted them; the lessee wound up getting the property it wanted; and the brokers, whose efforts made it possible for the owners to get paid $120,000 more for their property, got nothing for their efforts.

In this situation, the purchase price, including the amount of the brokers' commission, was a material element of the Fleming earnest money agreement. Since the lessee did not purchase the building on the same terms and conditions as those contained in the Fleming offer, that agreement did not become null and void. Accordingly, the trial court erred when it dismissed the brokers' contract cause of action against the building owners based on the 5 percent commission clause in the Fleming earnest money agreement.

---

[11]*Accord, Anderson v. Draddy,* 458 So. 2d 803, 804–05 (Fla. Dist. Ct. App. 1984), *review denied,* 467 So. 2d 999 (1985); *Coastal Bay Golf Club, Inc. v. Holbein,* 231 So. 2d 854, 857–58 (Fla. Dist. Ct. App. 1970); *Furla Studios, Inc. v. Gillen,* 133 Ill. App. 2d 620, 624–26, 273 N.E.2d 220 (1971); *Yorkridge Serv. Corp. v. Boring,* 38 Md. App. 624, 626–27, 382 A.2d 343 (1978); *Doughty Appliance, Inc. v. White,* 282 Or. 757, 760, 580 P.2d 186 (1978); *Hartmann v. Windsor Hotel Co.,* 132 W. Va. 307, 315, 52 S.E.2d 48 (1949). *See Lohmann v. Bellah,* 441 F.2d 458, 460 (10th Cir. 1971); *Culley v. Grand Junction Legion Bldg. Corp.,* 138 Colo. 254, 258, 331 P.2d 514 (1958); *Foster v. Hon,* 482 S.W.2d 139, 142–43 (Tenn. Ct. App. 1970). *See also Smith v. Hevro Realty Corp.,* ___ Conn. ___, 507 A.2d 980 (1986).

■ Furthermore, the trial court also erred when it dismissed the brokers' tortious third party interference cause of action.

The basic elements going into a prima facie establishment of the tort are (1) the existence of a valid contractual relationship or business expectancy; (2) knowledge of the relationship or expectancy on the part of the interferor; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted.

*Calbom v. Knudtzon*, 65 Wn.2d 157, 162–63, 396 P.2d 148 (1964).

The record before us reflects more than that the owners and the lessee simply bypassed Fleming and the brokers in consummating the sale. The closing statement for the sale of the building was prepared to show the sales price to be a full $600,000. The lessee then purported to pay that full $600,000 but actually only paid a sales price of $570,000. The owners repaid the $30,000 difference, the amount of the fee the brokers would have been paid, by writing out 1– or 2–sentence promissory notes payable to the lessee. This resulted in the real estate excise tax paid, which is a public record,[12] being in the amount that would have been paid if the sale had actually been for $600,000. Paul Liao, one of the lessee's principals, was asked about the closing statement in his deposition, and answered as follows:

Q Can you identify Exhibit 6?
A Yes.
Q What is it?
A The closing statement.
Q Does it reflect the sales price of $600,000?
A Right.
Q But it was your intention to actually [*sic*] only $570,000?
A Right.
Q Why didn't you just buy it for $570,000?
A Well, we tried to stay with—tried to be as close to the

---

[12]*See* RCW 82.45.090, .120.

terms as possible, the offer.

Q  That was the reason for the $600,000, to stay as close to the terms?

A  To prevent any unnecessary litigation.

Also in connection with the sale, a written agreement was entered whereby the lessee agreed to hold the owners harmless from the consequences of this conduct. It provided:

1. [Lessee] shall hold [owners] harmless from any and all liability, including attorney's fees and costs, arising from any claim by [the brokers], or their respective assigns, for a real estate commission arising from the Fleming offer.

2. [Owners], and its individual partners, each agrees, at [lessee's] request, to render all reasonable cooperation in such a defense.

Although the owners and lessee vigorously argue that they were legally entitled to bypass the brokers, they were not. Construing all reasonable inferences from the foregoing facts in favor of the brokers, as we must in this summary judgment case,[13] a trier of the fact could conclude as follows: that there was a valid contract between the property owners and the brokers whereby the owners would owe the brokers a $30,000 commission if they found an acceptable buyer; that the lessee knew of this contract; that the lessee intentionally induced the owners to breach the contract in order to save $30,000 on the price of the property; that illusory promissory notes were given, a misleading closing statement prepared and incorrect real estate excise taxes calculated, all for the purpose of concealing the true facts from the brokers and Fleming as to the actual purchase price paid by the lessee; and that the brokers were damaged thereby. Thus, the brokers have also made out a legally sufficient case of tortious third party interference with a contractual relationship, *Calbom v. Knudtzon, supra,* and the trial court's granting of the defense motions for summary judgment cannot be sustained, CR 56(c).

---

[13]*Millikan v. Board of Directors,* 93 Wn.2d 522, 532, 611 P.2d 414 (1980).

Reversed and remanded.

ENNIS and WILSON, JJ. Pro Tem., concur.