178 P.3d 995 (2008)
Hans YORK and Katherine York, parents of Aaron E. York and Abraham P. York; and Sharon A. Schneider and Paul A. Schneider, parents of Tristan S. Schneider, Appellants,
v.
WAHKIAKUM SCHOOL DISTRICT NO. 200; W. Robert Garrett, in his official capacity as superintendent of Wahkiakum School District No. 200; Frank Webb, Kari Kandoll, David Smith, Lee Tischer, Cathy Turgeon, in their official capacities as members of the Board of Directors of Wahkiakum School District *996 No. 200; Wahkiakum County Department of Health; Anne Ozment, in her official capacity as director of the Wahkiakum County Department of Health; Wahkiakum County Board of Health; Ron Ozment, Dick Marsyla, and Esther Gregg, in their official capacities as members of the Wahkiakum County Board of Health, Respondents.
No. 78946-1.
Supreme Court of Washington, En Banc.
Argued May 8, 2007.
Decided March 13, 2008.
*997 Aaron Caplan, American Civil Liberties Union of Washington Foundation, for plaintiffs/Appellants.
Eric B. Martin, Reed Smith LLP, Richmond, Natasha Shekdar Black, Davis Wright Tremaine, Seattle, for Appellants.
Frederick Alan Johnson, Cathlamet, for Respondents.
Karin Lisa Nyrop, Atty. Gen. Div./U. of Wash., Shannon Elizabeth Inglis, Attorney General's Office/Criminal Justice, Seattle, Carol A. Murphy, Attorney General's Office, Olympia, for Amicus Curiae (Attorney General).
David Zuckerman, Seattle, Daniel N. Abrahamson, Theshia Naidoo, Tamar Todd, Drug Policy Alliance, Berkeley, CA, for Amicus Curiae (Washington Education Assoc. and Drug Policy Alliance).
SANDERS, J.
¶ 1 The question before us is whether random and suspicionless drug testing of student athletes violates article I, section 7 of the Washington State Constitution.[1]
¶ 2 The Wahkiakum School District (school district) randomly drug tests all student athletes under the authority of Wahkiakum School Board Policy No. 3515 (policy 3515). Aaron and Abraham York and Tristan Schneider played sports for Wahkiakum High School, agreed to the policy, and were tested. Their parents (York and Schneider parents) sued the school district alleging its drug testing policy violated article I, section 7 of the Washington State Constitution. The school district claims random drug testing, without any individualized suspicion, is constitutional. The superior court agreed. We accepted direct review.
¶ 3 The school district asks us to adopt a "special needs" exception to the warrant requirement to allow random and suspicionless drug testing. But we do not recognize such an exception and hold warrantless random and suspicionless drug testing of student athletes violates the Washington State Constitution.

*998 FACTS

¶ 4 Wahkiakum requires its student athletes to refrain from using or possessing alcohol or illegal drugs. Beginning in 1994, the school district implemented myriad ways to combat drug and alcohol use among the student population. Nevertheless, drug and alcohol problems persisted. Acting independently of the school district, the Wahkiakum Community Network (community network) began surveying district students. From these surveys, the community network ranked teen substance abuse as the number one problem in Wahkiakum County. As reiterated by the trial court, the community network's surveys showed that in 1998, 40 percent of sophomores reported previously using illegal drugs and 19 percent of sophomores reported illegal drug use within the previous 30 days, while 42 percent of seniors reported previously using illegal drugs and 12.5 percent reported illegal drug use within the previous 30 days. Clerk's Papers (CP) at 484-85 (Undisputed Facts 10(c), (d)). In 2000, 50 percent of student athletes self-identified as drug and/or alcohol users. Id. (Undisputed Fact 10(e)).
¶ 5 As a result, the school district decided to implement random drug testing where all students may be tested initially and then subjected to random drug testing during the remainder of the season. The school district formed the Drug and Alcohol Advisory Committee (now the "Safe and Drug Free Schools Advisory Committee") to help deal with the student substance abuse problems. CP at 485 (Undisputed Fact 15). The committee evaluated the effectiveness of its previous programs, such as D.A.R.E. (Drug Abuse Resistance Education) and support groups, and contemplated adopting policy 3515, which would require random drug testing of student athletes.[2] The trial court found:
Based upon the evidence of substantial alcohol and drug use among students and pursuant to the School District's statutory authority and responsibility to maintain order and discipline in its schools, to protect the health and safety of its students, and to control, supervise and regulate interschool athletics, the Board of Directors adopted the policy.
CP at 486 (Undisputed Fact 16).
¶ 6 As part of the policy, all student athletes must agree to be randomly drug tested as a condition of playing extracurricular sports. The drug testing is done by urinalysis, with the student in an enclosed bathroom stall and a health department employee outside. The sample is then mailed to Comprehensive Toxicology Services in Tacoma, Washington.[3] If the results indicate illegal drug use, then the student is suspended from extracurricular athletic activities; the length of suspension depends on the number of infractions and whether the student tested positive for illegal drugs or alcohol. Also, the school district provides students with drug and alcohol counseling resources. The results are not sent to local law enforcement or included in the student's academic record. And the student is not suspended from school, only extracurricular sports.
¶ 7 During the 1999-2000 school year, Aaron York and Abraham York played sports and were tested under the policy. And Tristan Schneider was tested under the policy during the 2000-2001 year. The York and Schneider parents brought suit arguing the school district's policy violated the Washington State Constitution.[4] Their motion for a *999 preliminary injunction was denied by superior court Judge Penoyar, and the Court of Appeals dismissed the petition as moot. See York v. Wahkiakum Sch. Dist. No. 200, 110 Wash.App. 383, 40 P.3d 1198 (2002). The trial court then held that while the school district's policy "approached the tolerance limit" of our constitution, the policy was nevertheless constitutional and narrowly tailored to reach a compelling government end. CP at 497.
¶ 8 The York and Schneider parents sought and obtained direct review in our court of a summary judgment order and ask us to determine whether the school district's policy 3515 is constitutional.

STANDARD OF REVIEW
¶ 9 We review summary judgment de novo. W. Telepage, Inc. v. City of Tacoma, 140 Wash.2d 599, 607, 998 P.2d 884 (2000). We construe the facts and the inferences from the facts in a light most favorable to the nonmoving party. Reid v. Pierce County, 136 Wash.2d 195, 201, 961 P.2d 333 (1998). Finally, we review questions of constitutional construction de novo. State v. Norman, 145 Wash.2d 578, 579, 40 P.3d 1161 (2002).

ANALYSIS
¶ 10 We are aware there are strong arguments, policies, and opinions marshaled on both sides of this debate, but we are concerned only with the policy's constitutionality. And while we are loath to disturb the decisions of a local school board, we will not hesitate to intervene when constitutional protections are implicated. Millikan v. Bd. of Dirs., 93 Wash.2d 522, 527, 611 P.2d 414 (1980). No matter the drawbacks or merits of the school district's random drug testing, we cannot let the policy stand if it offends our constitution. Students "do not `shed their constitutional rights' at the schoolhouse door." Goss v. Lopez, 419 U.S. 565, 574, 95 S.Ct. 729, 42 L.Ed.2d 725 (1975) (quoting Tinker v. Des Moines Sch. Dist., 393 U.S. 503, 506, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969)).
¶ 11 The question before us is narrow: Whether Wahkiakum School District's blanket policy requiring student athletes to submit to random drug testing is constitutional. The United States Supreme Court has held such activity does not violate the Fourth Amendment to the federal constitution. Vernonia Sch. Dist., 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564. But we have never decided whether a suspicionless, random drug search of student athletes violates article I, section 7 of our state constitution. Therefore, we must decide whether our state constitution follows the federal standard or provides more protection to students in the state of Washington.
I. May Wahkiakum School District Perform Suspicionless, Random Drug Tests of Student Athletes?
a. Federal cases concerning public school searches
¶ 12 The school district argues we should follow federal cases and allow suspicionless, random drug testing of its student athletes. Two federal cases are apposite to our consideration. These cases, while helpful, do not control how we interpret our state constitution. City of Seattle v. Mighty Movers, 152 Wash.2d 343, 356, 96 P.3d 979 (2004). There are stark differences in the language of the two constitutional protections; unlike the Fourth Amendment, article I, section 7 is not based on a reasonableness standard.
¶ 13 The United States Supreme Court has held public school searches presented a "special need," which allowed a departure from the warrant and probable cause requirements. New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).[5] The T.L.O. Court held school teachers and administrators could search students without a *1000 warrant if: (1) there existed "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school," and (2) the search is "not excessively intrusive in light of the age and sex of the student and the nature of the infraction." Id. at 341-42, 105 S.Ct. 733.
¶ 14 Next, in Acton, a public school district implemented a random drug testing of school athletes, similar to the one at issue here. Vernonia Sch. Dist., 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564. Each student athlete was tested at the beginning of the season and then each week 10 percent were randomly selected for testing. Most critics of Acton are not persuaded the majority's analysis justifies a suspicionless search of the student athletes. But the Acton majority claimed individualized suspicion would unduly interfere with the government's goals and might actually make the situation worse. Its reasoning was based primarily on three rationales: (1) individualized suspicion would "transform[] the process into a badge of shame," id. at 663, 115 S.Ct. 2386 where teachers could claim any troublesome student was abusing drugs; (2) teachers and student officials are neither trained nor equipped to spot drug use; and (3) individualized suspicion creates an unnecessary loss of resources in defending claims and lawsuits against arbitrary imposition, when students and parents will inevitably challenge whether reasonable suspicion did indeed exist. Id. at 664, 115 S.Ct. 2386 ("In many respects, we think, testing based on `suspicion' of drug use would not be better, but worse.").[6]
¶ 15 But these arguments were unpersuasive several years earlier when the Court applied an individualized suspicion standard to public schools in T.L.O. The Acton majority never adequately explained why individual suspicion was needed in T.L.O. but not in Acton. Justice O'Connor spent much of her dissent taking issue with this standard:
[N]owhere is it less clear that an individualized suspicion requirement would be ineffectual than in the school context. In most schools, the entire pool of potential search targetsstudentsis under constant supervision by teachers and administrators and coaches, be it in classrooms, hallways, or locker rooms. . . .
. . . The great irony of this case is that most (though not all) of the evidence the District introduced to justify its suspicionless drug testing program consisted of first- or second-hand stories of particular, identifiable students acting in ways that plainly gave rise to reasonable suspicion of in-school drug useand thus that would have justified a drug-related search under our T.L.O. decision.
Acton, 515 U.S. at 678-79, 115 S.Ct. 2386 (O'Connor, J., dissenting).[7]
¶ 16 The Wahkiakum School District modeled its policy after the one used by the Vernonia School District. But simply passing muster under the federal constitution does not ensure the survival of the school district's policy under our state constitution. The Fourth Amendment provides for "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. CONST. amend. IV. Therefore, a Fourth Amendment analysis hinges on whether a warrantless search is reasonable, and it is possible in some circumstances for a search to be reasonable without a warrant. See Acton, 515 U.S. at 652, 115 S.Ct. 2386 ("As the text of the Fourth Amendment indicates, *1001 the ultimate measure of the constitutionality of a governmental search is `reasonableness.'"). But our state constitutional analysis hinges on whether a search has "authority of law"in other words, a warrant. WASH. CONST. art. I, § 7.
b. Search and seizure analysis under article I, section 7
¶ 17 Our state constitution provides, "No person shall be disturbed in his private affairs, or his home invaded, without authority of law." WASH. CONST. art. I, § 7. It is well established that in some areas, article I, section 7 provides greater protection than its federal counterpartthe Fourth Amendment. State v. McKinney, 148 Wash.2d 20, 29, 60 P.3d 46 (2002); State v. Myrick, 102 Wash.2d 506, 510, 688 P.2d 151 (1984) ("[T]he unique language of Const. art. 1, § 7 provides greater protection to persons under the Washington Constitution than U.S. Const. amend. 4 provides to persons generally."). When determining whether article I, section 7 provides greater protection in a particular context, we focus on whether the unique characteristics of the constitutional provision and its prior interpretations compel a particular result. State v. Walker, 157 Wash.2d 307, 317, 138 P.3d 113 (2006). We look to the constitutional text, historical treatment of the interest at stake, relevant case law and statutes, and the current implications of recognizing or not recognizing an interest. Id.
¶ 18 This requires a two-part analysis. First, we must determine whether the state action constitutes a disturbance of one's private affairs. Here that means asking whether requiring a student athlete to provide a urine sample intrudes upon the student's private affairs. Second, if a privacy interest has been disturbed, the second step in our analysis asks whether authority of law justifies the intrusion. The "authority of law" required by article I, section 7 is satisfied by a valid warrant, limited to a few jealously guarded exceptions. Because the Wahkiakum School District had no warrant, if we reach the second prong of the analysis we must decide whether the school district's activity fits within an exception to the warrant requirement. Relying on federal law, the school district claims there is a "special needs" exception to the warrant requirement that we should adopt. The York and Schneider parents point out we have not adopted such an exception and urge us not to do so here.
II. Suspicionless, Random Drug Testing Disturbs a Student Athlete's Private Affairs.
¶ 19 When inquiring about private affairs, we look to "`those privacy interests which citizens of this state have held, and should be entitled to hold, safe from governmental trespass absent a warrant.'" State v. Young, 123 Wash.2d 173, 181, 867 P.2d 593 (1994) (quoting State v. Myrick, 102 Wash.2d 506, 511, 688 P.2d 151 (1984)). This is an objective analysis.
¶ 20 The private affair we are concerned with today is the State's interference in a student athlete's bodily functions. Specifically, does it intrude upon a privacy interest to require a student athlete to go into a bathroom stall and provide a urine sample, even against that student's protest? Federal courts and our court both agree the answer is an unqualified yes, such action intrudes into one's reasonable expectation of privacy. Robinson v. City of Seattle, 102 Wash.App. 795, 813 n. 50, 10 P.3d 452 (2000) (citing Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); In re Juveniles A, B, C, D, E, 121 Wash.2d 80, 90, 847 P.2d 455 (1993); State v. Olivas, 122 Wash.2d 73, 83, 856 P.2d 1076 (1993); State v. Meacham, 93 Wash.2d 735, 738, 612 P.2d 795 (1980); State v. Curran, 116 Wash.2d 174, 184, 804 P.2d 558 (1991)). Indeed, we offer heightened protection for bodily functions compared to the federal courts. Robinson, 102 Wash.App. 795, 10 P.3d 452.
¶ 21 But the school district claims student athletes have a lower expectation of privacy. Certainly, students who choose to play sports are subjected to more regulation. For example, RCW 28A.600.200 provides, "Each school district board of directors is hereby granted and shall exercise the authority to control, supervise and regulate the conduct of interschool *1002 athletic activities."[8] And certainly there is generally less privacy in locker rooms than in other parts of a school. But the district does not link regulations and the communal atmosphere of locker rooms with a student's lowered expectation of privacy in terms of being subjected to suspicionless, random drug testing. We do not see how what happens in the locker room or on the field affects a student's privacy in the context of compelling him or her to provide a urine sample.[9] A student athlete has a genuine and fundamental privacy interest in controlling his or her own bodily functions. The urinalysis test is by itself relatively unobtrusive. Nevertheless, a student is still required to provide his or her bodily fluids. Even if done in an enclosed stall, this is a significant intrusion on a student's fundamental right of privacy. See Robinson, 102 Wash.App. at 822, 10 P.3d 452.
¶ 22 This analysis should in no way contradict what we have previously said about students' privacy interests. Generally we have recognized students have a lower expectation of privacy because of the nature of the school environment. Courts have held a school official needs some "reasonable" or "individualized" suspicion in order to protect students from arbitrary searches, yet still give officials sufficient leeway to conduct their duties. T.L.O., 469 U.S. at 341, 105 S.Ct. 733; State v. McKinnon, 88 Wash.2d 75, 558 P.2d 781 (1977). Our court discussed student searches and student rights under the Fourth Amendment prior to the United States Supreme Court's holding in T.L.O. In McKinnon, we said:
Although a student's right to be free from intrusion is not to be lightly disregarded, for us to hold school officials to the standard of probable cause required of law enforcement officials would create an unreasonable burden upon these school officials. Maintaining discipline in schools oftentimes requires immediate action and cannot await the procurement of a search warrant based on probable cause. We hold that the search of a student's person is reasonable and does not violate his Fourth Amendment rights, if the school official has reasonable grounds to believe the search is necessary in the aid of maintaining school discipline and order.
McKinnon, 88 Wash.2d at 81, 558 P.2d 781. And in Kuehn, we also opined in dicta that although a warrant or probable cause might be unnecessary to search a student's backpack, the school nevertheless needed to articulate some reasonable suspicion to justify a search of a student under both the Fourth Amendment and article I, section 7. Kuehn v. Renton Sch. Dist. No. 403, 103 Wash.2d 594, 694 P.2d 1078 (1985); State v. Slattery, 56 Wash.App. 820, 823, 787 P.2d 932 (1990) ("Under the school search exception, school officials may search students if, under all the circumstances, the search is reasonable."); State v. B.A.S., 103 Wash.App. 549, 554 n. 8, 13 P.3d 244 (2000).[10]
¶ 23 We decided these cases before the United States Supreme Court decided T.L.O., which cited McKinnon when it also held reasonable suspicion was necessary to search a student. T.L.O., 469 U.S. at 333 n. 2, 105 S.Ct. 733. Nevertheless, in State v. Brooks, 43 Wash.App. 560, 568, 718 P.2d 837 (1986), the Court of Appeals analyzed McKinnon and Kuehn and said, "Accordingly, since the holding in T.L.O. is consistent *1003 with our Supreme Court's holding in McKinnon, we conclude that article 1, section 7 affords students no greater protections from searches by school officials than is guaranteed by the Fourth Amendment." The school district points to this one sentence to say we should adopt whole cloth the federal analysis with regards to both student searches and student drug testing. But Brooks did not involve drug testing and was decided before Acton. Nor are we bound to the Court of Appeals' broad language.
¶ 24 Because we determine that interfering with a student athlete's bodily functions disturbs one's private affairs, we must address the second prong of the article I, section 7 analysis: does the school district have the necessary authority of law to randomly drug test student athletes?
III. Under Article I, Section 7 There Is No Authority of Law That Allows a School District to Conduct Random Drug Tests.
¶ 25 We have long held a warrantless search is per se unreasonable, unless it fits within one of the "`jealously and carefully drawn exceptions.'" State v. Hendrickson, 129 Wash.2d 61, 70, 917 P.2d 563 (1996) (internal quotation marks omitted) (quoting State v. Houser, 95 Wash.2d 143, 149, 622 P.2d 1218 (1980)). These exceptions include exigent circumstances, consent, searches incident to a valid arrest, inventory searches, the plain view doctrine, and Terry[[11]] investigative stops. Robinson, 102 Wash.App. at 813, 10 P.3d 452. Any exceptions to the warrant requirement must be rooted in the common law. State v. Ladson, 138 Wash.2d 343, 979 P.2d 833 (1999); Robinson, 102 Wash.App. at 813, 10 P.3d 452. And it is always the government's burden to show its random drug testing fits within one of these narrow exceptions. City of Seattle v. Mesiani, 110 Wash.2d 454, 457, 755 P.2d 775 (1988). Today the school district asks us to accept an analog to the federal special needs doctrine to justify its drug testing policy. The York and Schneider parents point out we have never formally adopted a special needs exception and therefore claim no exception to the warrant requirement exists here.
a. Federal special needs exception
¶ 26 Before addressing whether we have adopted or will adopt such a special needs exception, it is helpful to briefly examine the federal exception to understand both its requirements and its breadth. The United States Supreme Court has held there are certain circumstances when a search or seizure is directed toward "`special needs, beyond the normal need for law enforcement" and "the warrant and probable-cause requirement [are] impracticable.'" Griffin v. Wisconsin, 483 U.S. 868, 873, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987) (quoting T.L.O., 469 U.S. at 351, 105 S.Ct. 733 (Blackmun, J., concurring in judgment)).[12] For there to be a special need, not only must there be some interest beyond normal law enforcement but also any evidence garnered from the search or seizure should not be expected to be used in any criminal prosecution against the target of the search or seizure. Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989).[13] The Court has applied such reasoning to administrative searches,[14] border patrols,[15] and prisoners *1004 and probationers.[16]
¶ 27 The United States Supreme Court has also held drug testing presents a special need and may be done under certain circumstances without a warrant or individualized suspicion. In Skinner, 489 U.S. at 634, 109 S.Ct. 1402, the Court upheld warrantless and suspicionless blood and urine testing of railroad employees following major train accidents. The Court applied similar reasoning in Von Raab when it held immigration officials may be subjected to random drug testing. Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989).[17]
b. Is there a Washington State special needs exception?
¶ 28 We have never adopted a special needs exception but have looked to federal special needs cases when dealing with similar issues. In cases concerning administrative searches,[18] border patrols,[19] and prisoners and probationers,[20] our courts have departed from the warrant requirement in similar, but not always identical, ways.
¶ 29 In Juveniles A, B, C, D, E, 121 Wash.2d 80, 847 P.2d 455, we held convicted sex offenders could be tested for HIV (human immunodeficiency virus). But because neither party briefed nor asked for an independent construction of the state constitution, we relied exclusively on federal cases when deciding Juveniles A, B, C, D, E. Id. at 91 n. 6, 847 P.2d 455. In Curran, 116 Wash.2d 174, 804 P.2d 558, we held taking blood pursuant to former RCW 46.20.308(3) (1987) did not violate article I, section 7 if there was a clear indication it would reveal evidence of intoxication and was performed in a reasonable manner. In Olivas, 122 Wash.2d 73, 856 P.2d 1076, after we analyzed the federal reasoning in Skinner, 489 U.S. 602, 109 S.Ct. 1402 and Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685, we held the State may conduct blood tests of violent sex offenders without a warrant, probable cause, or individualized suspicion under both the United States and Washington State Constitutions.
¶ 30 In Robinson, 102 Wash.App. at 827-28, 10 P.3d 452, the Court of Appeals held the city of Seattle could require a preemployment urinalysis test of police officers, firefighters, *1005 and any other city position where public safety is in jeopardy. In its analysis, the Court of Appeals claimed our court had accepted a variation of the federal "special needs" analysis:
Although the special needs analysis appears to be an established part of Fourth Amendment jurisprudence, the Washington Supreme Court has developed a different approach for article I, section 7 analysis of governmental searches outside the context of law enforcement.
Id. at 816-17, 10 P.3d 452 (footnote omitted). The Robinson court examined several of our cases, including Juveniles A, B, C, D, E, and said:
"[The Washington State Supreme Court has] recognized two types of privacy: the right to nondisclosure of intimate personal information or confidentiality, and the right to autonomous decisionmaking. The former may be compromised when the State has a rational basis for doing so, while the latter may only be infringed when the State acts with a narrowly tailored compelling state interest."
Id. at 817, 10 P.3d 452 (quoting Juveniles A, B, C, D, E, 121 Wash.2d at 96-97, 847 P.2d 455). But aside from what Robinson claims we did, we have not created a general special needs exception or adopted a strict scrutiny type analysis that would allow the State to depart from the warrant requirement whenever it could articulate a special need beyond the normal need for law enforcement. In the context of randomly drug testing student athletes, we see no reason to invent such a broad exception to the warrant requirement as such an alleged exception cannot be found in the common law. See Ladson, 138 Wash.2d at 350, 979 P.2d 833 (finding no common law exception for a pretextual warrantless traffic stop).
c. Washington State cases concerning suspicionless searches
¶ 31 Though we have not considered drug testing in public schools, we have a long history of striking down exploratory searches not based on at least reasonable suspicion. State v. Jorden, 160 Wash.2d 121, 127, 156 P.3d 893 (2007) ("[T]his court has consistently expressed displeasure with random and suspicionless searches, reasoning that they amount to nothing more than an impermissible fishing expedition."); Robinson, 102 Wash.App. at 815, 10 P.3d 452 ("Our Supreme Court has thus not been easily persuaded that a search without individualized suspicion can pass constitutional muster."). In Mesiani, this court held a random roadblock sobriety checkpoint program initiated by Seattle police was "highly intrusive" search and violated "the right to not be disturbed in one's private affairs guaranteed by article I, section 7." Mesiani, 110 Wash.2d at 458-60, 755 P.2d 775.[21] In Kuehn, this court held a search of student luggage required by school officials as a condition of participation in a school-sponsored trip to Canada violated both the Fourth Amendment and article I, section 7. Kuehn, 103 Wash.2d at 595, 694 P.2d 1078. We opined, "[i]n the absence of individualized suspicion of wrongdoing, the search is a general search. `[W]e never authorize general, exploratory searches,'" (alteration in original) and such searches are "anathema to the Fourth Amendment and Const. art. 1, § 7 protections." Id. at 599, 694 P.2d 1078 (quoting State v. Helmka, 86 Wash.2d 91, 93, 542 P.2d 115 (1975)); id. at 601-02, 694 P.2d 1078.
¶ 32 The few times we have allowed suspicionless searches, we did so either relying entirely on federal law or in the context of criminal investigations or dealing with prisoners. In Meacham, 93 Wash.2d at 738-39, 612 P.2d 795, we upheld mandatory blood tests of putative fathers. In Juveniles A, B, C, D, E, 121 Wash.2d at 90, 847 P.2d 455, we upheld mandatory HIV tests of convicted sexual offenders. In Olivas, 122 Wash.2d at 83, 856 P.2d 1076, we upheld blood tests of convicted felons without individualized suspicion. And recently in State v. Surge, 160 Wash.2d 65, 156 P.3d 208 (2007), we held a DNA sampling of convicted felons did not *1006 violate article I, section 7. That case allowed for warrantless testing without individualized suspicion because we asserted such testing did not disturb a reasonable right to privacy. But these cases present far different factual situations from drug testing student athletes. A felon has either already pleaded guilty or been found guilty beyond a reasonable doubt of a serious crime; a student athlete has merely attended school and chosen to play extracurricular sports. Most troubling, however, is that we can conceive of no way to draw a principled line permitting drug testing only student athletes. If we were to allow random drug testing here, what prevents school districts from either later drug testing students participating in any extracurricular activities, as federal courts now allow, or testing the entire student population?
¶ 33 We cannot countenance random searches of public school student athletes with our article I, section 7 jurisprudence. As stated earlier, we require a warrant except for rare occasions, which we jealously and narrowly guard. We decline to adopt a doctrine similar to the federal special needs exception in the context of randomly drug testing student athletes. In sum, no argument has been presented that would bring the random drug testing within any reasonable interpretation of the constitutionally required "authority of law." See Mesiani, 110 Wash.2d at 458, 755 P.2d 775.
¶ 34 Accordingly, we hold the school district's policy 3515 is unconstitutional and violates student athletes' rights secured by article I, section 7. Therefore we reverse the superior court. The York and Schneider parents shall recover their costs.
WE CONCUR: GERRY L. ALEXANDER, C.J., SUSAN OWENS, TOM CHAMBERS, JJ.
MADSEN, J. (concurring).
¶ 35 While I agree with the majority's holding that the school's drug testing program does not withstand constitutional scrutiny, I disagree that article I, section 7 of the Washington Constitution categorically prohibits our adoption of the "special needs" exception. The majority's analysis sweeps far too broadly, casting doubt on the validity of even suspicion-based school searches. As noted by Justice J.M. Johnson in his concurring opinion, even before the United States Supreme Court issued New Jersey v. T.L.O., 469 U.S. 325, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985), this court sanctioned school searches on less than probable cause in view of the unique responsibilities of school officials and the diminished privacy interests of students. Concurrence (J.M. Johnson, J.) at 16. I believe that a narrowly drawn special needs exception also is consistent with Washington law. However, I concur in the result reached by the majority because on this record there is no special need that justifies suspicionless drug testing of Wahkiakum School District's student athletes. In particular, the school district has failed to show that a suspicion-based regime of drug testing is inadequate to achieve its legitimate objectives.
¶ 36 Article I, section 7 prohibits the government from intruding on a citizen's "private affairs" without "authority of law." WASH. CONST. art. I, § 7. As this court has held, "authority of law" may be supplied by an exception to the warrant requirement that is rooted in "`well-established principles of the common law.'" State v. Ladson, 138 Wash.2d 343, 350, 979 P.2d 833 (1999) (quoting City of Seattle v. McCready, 123 Wash.2d 260, 273, 868 P.2d 134 (1994)). One such well-established common law principle is that a warrantless search may be permissible when the purpose of the search is other than the detection or investigation of a crime. For example, a warrantless inventory search of an automobile is permissible under article I, section 7 for the purposes of preventing property loss and protecting the police from liability. State v. Houser, 95 Wash.2d 143, 155, 622 P.2d 1218 (1980). Similarly, under the community caretaking exception, a warrantless search may be permissible when necessary for the purpose of rendering aid or performing routine health and safety checks. State v. Thompson, 151 Wash.2d 793, 802, 92 P.3d 228 (2004); State v. Acrey, 148 Wash.2d 738, 754, 749, 64 P.3d 594 (2003) (police justified in detaining 12-year-old shortly after midnight in an isolated area and transporting *1007 him home at mother's request) (citing and quoting Cady v. Dombrowski, 413 U.S. 433, 441, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973) (enunciating "community caretaking function[]" exception to warrant requirement); State v. Kinzy, 141 Wash.2d 373, 386, 5 P.3d 668 (2000) (same), cert. denied, 531 U.S. 1104, 121 S.Ct. 843, 148 L.Ed.2d 723 (2001)).
¶ 37 Another well-established common law principle is that a warrantless search may be permissible when adherence to the warrant requirement would be impracticable under the circumstances. Thus, we have recognized that warrantless searches may be permissible under article I, section 7 when certain exigent circumstances require immediate action to avoid the destruction of evidence or the flight of a suspect. State v. Cardenas, 146 Wash.2d 400, 405-07, 47 P.3d 127, 57 P.3d 1156 (2002) (warrantless entry to motel room in hot pursuit of armed robbery suspects); State v. Johnson, 128 Wash.2d 431, 454, 909 P.2d 293 (1996) (exigency created by ready mobility of vehicles supports warrantless automobile search); State v. Stroud, 106 Wash.2d 144, 147, 151, 720 P.2d 436 (1986) (same); State v. Baldwin, 109 Wash.App. 516, 523, 37 P.3d 1220 (2001) (exigent circumstances may justify warrantless blood drug test of DUI (driving under influence) suspect).
¶ 38 Contrary to the majority's view, the "special needs" exception is rooted in these well-established common law principles. See In re Juveniles A, B, C, D, E, 121 Wash.2d 80, 100, 847 P.2d 455 (1993) (recognizing the "`special needs'" exception is among the "`few specifically established and well-delineated exceptions'" to the warrant requirement (quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); California v. Acevedo, 500 U.S. 565, 580, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991))). We recently addressed the special needs exception in State v. Surge, 160 Wash.2d 65, 156 P.3d 208 (2007). In that case, we held that suspicionless DNA (deoxyribonucleic acid) testing of convicted felons is permissible under the Fourth Amendment to the United States Constitution, applying either the special needs exception or the exception for minimally intrusive searches. Id. at 81, 156 P.3d 208. Because we concluded such testing does not intrude on a convicted felon's "private affairs," we had no need to address whether the special needs exception would have provided the necessary "authority of law" under article I, section 7. However, nothing in the plurality and concurring opinions suggests the special needs exception to the warrant requirement is inconsistent with article I, section 7, although the plurality suggests the scope of the exception must be narrowly drawn. See also State v. Olivas, 122 Wash.2d 73, 856 P.2d 1076 (1993) (recognizing special needs exception to warrant requirement allows suspicionless DNA testing of convicted felons under the Fourth Amendment, while declining to decide the issue under article I, section 7 for inadequate briefing).
¶ 39 The special needs exception encompasses a "closely guarded category of constitutionally permissible suspicionless searches." Chandler v. Miller, 520 U.S. 305, 309, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). There are two threshold requirements to establish a "special need." First, the need must be "special" in the sense that it serves a purpose other than the ordinary need for effective law enforcement. Skinner, 489 U.S. at 619, 109 S.Ct. 1402; see, e.g., Nat'l Treasury Employees Union v. Von Raab, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989) (special need to detect drug use by armed customs officials to deter malfeasance where test results may not be used in a criminal prosecution absent employee's consent); cf. Ferguson v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001) (no special need for nonconsensual drug testing of pregnant hospital patients where results are conveyed to law enforcement); City of Indianapolis v. Edmond, 531 U.S. 32, 121 S.Ct. 447, 148 L.Ed.2d 333 (2000) (no special need for suspicionless highway checkpoint stops where primary purpose was crime control). Second, and more importantly, the traditional requirement of a warrant and probable cause must be inadequate to fulfill the purpose of the search. Von Raab, 489 U.S. at 665-66, 109 S.Ct. 1384; see, e.g., United States v. Martinez-Fuerte, 428 U.S. 543, 556-61, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976) (inability to detect *1008 contraband in passing vehicles justifies suspicionless border stop); cf. Chandler, 520 U.S. at 321, 117 S.Ct. 1295 (no special need for drug-testing political candidates who are subject to intensive public scrutiny). In determining whether a special need justifies a warrantless search, courts evaluate the nature of the privacy interest involved, the character of the governmental intrusion, the need and immediacy of the government's concerns, and the efficacy of the means chosen to meet those concerns.
¶ 40 Remarkably, the term "special needs" first appeared in a Supreme Court opinion adopting the view of this court (among others) that "the special needs of the school environment" justify warrantless searches by school authorities who have a reasonable suspicion the search will unearth a student's illicit activity. T.L.O., 469 U.S. at 332 n. 2, 105 S.Ct. 733 (citing State v. McKinnon, 88 Wash.2d 75, 558 P.2d 781 (1977)). In McKinnon, id. at 80, 558 P.2d 781, we recognized school officials must be free "to maintain order and discipline" in the school environment in order to carry out their duties of both educating and protecting the children in their care. We observed that maintaining discipline and order often requires immediate action, which is incompatible with a warrant requirement. Accordingly, this court adopted a flexible approach to evaluating the propriety of a school search, involving a fact-intensive inquiry that takes into account the child's age, history, and school record; the seriousness of the illicit activity; the need for immediacy; and the reliability of the information provided. And, in Kuehn v. Renton School District No. 403, 103 Wash.2d 594, 694 P.2d 1078 (1985), although we disallowed suspicionless searches of the personal luggage of student band members, we held that such searches would be permissible based on a reasonable belief of wrongdoing.
¶ 41 Thus, we have recognized the school setting requires some modification of the level of suspicion of illicit activity needed to justify a search based upon the "special needs" in this environment. Of course, a suspicionless search is qualitatively different from a search based on individualized suspicion. Nevertheless, I agree with Justice J.M. Johnson that suspicionless drug testing may be permissible if the requirements necessary to meet the special needs exception are met.
¶ 42 However, I disagree with the test he proposes for evaluating whether a special need justifies a suspicionless search. According to Justice J.M. Johnson, "a constitutional program of random suspicionless drug testing of student athletes should advance compelling interests, show narrow tailoring, and employ a less intrusive method of testing." Concurrence (J.M. Johnson, J.) at 1019. Although a special needs analysis is similar to such strict scrutiny, it differs in important ways. In particular, an indispensable component of the special needs analysis is the impracticality of adherence to the traditional requirements. Regardless of the strength of the government's need for a search, or the closeness of the fit of the means chosen to achieve the state's legitimate goals, a search cannot be justified under the special needs exception absent a showing that adherence to the requirement of a warrant and probable cause would be impracticable under the circumstances. See, e.g., Barlow v. Ground, 943 F.2d 1132 (9th Cir.1991) (nonconsensual HIV (human immunodeficiency virus) test of man who bit police officer unjustifiable as a "special need" because there was no immediate need to test without a warrant).
¶ 43 A balancing test that omits this requirement threatens to turn "special needs" into an exception that swallows the general rule prohibiting warrantless searches. "[B]alancing tests without carefully prescribed limits can be inherently dangerous because `when an individual's suspected harmful conduct is balanced against societal interests, individual privacy losses will appear negligible in relation to government's efforts to protect society.'" Olivas, 122 Wash.2d at 105 n. 88, 856 P.2d 1076 (Utter, J., concurring) (quoting Kenneth Nuger, The Special Needs Rationale: Creating a Chasm in Fourth Amendment Analysis, 32 SANTA CLARA L.REV. 89, 95 (1992)). Thus, in Juveniles, Justice Utter warned that recognizing a special need for a suspicionless search without first finding an individualized *1009 suspicion standard unworkable in the particular context would create a potentially unlimited exception. Juveniles, 121 Wash.2d at 102, 847 P.2d 455 (Utter, J., concurring in part, dissenting in part). Similarly, in Olivas, Justice Utter took issue with the majority's application of the special needs test in the context of DNA testing of convicted felons, reasoning a search must be truly divorced from ordinary law enforcement purposes to fall within the exception. Olivas, 122 Wash.2d at 107-08, 856 P.2d 1076 (Utter, J., concurring).
¶ 44 In Surge, 160 Wash.2d at 81, 156 P.3d 208, we indicated our agreement with Justice Utter ("Certainly the concurring opinion in Olivas is more consistent with our cases interpreting article I, section 7." (citing Olivas, 122 Wash.2d at 107-08, 856 P.2d 1076)). Consistently with our decisions relating to other warrant exceptions, we suggested the scope of the special needs exception is more narrowly drawn under article I, section 7 than under the Fourth Amendment. See, e.g., Thompson, 151 Wash.2d 793, 92 P.3d 228 (limiting scope of community caretaking function); Kinzy, 141 Wash.2d at 395, 5 P.3d 668 (police exceeded scope of community caretaking function by detaining minor longer than necessary to assure her safety); State v. Ferrier, 136 Wash.2d 103, 114, 960 P.2d 927 (1998) (scope of consent search); State v. White, 135 Wash.2d 761, 768, 958 P.2d 982 (1998) (limiting automobile inventory searches to unlocked compartments); State v. Williams, 102 Wash.2d 733, 689 P.2d 1065 (1984) (limiting scope of community caretaking function); Stroud, 106 Wash.2d 144, 720 P.2d 436 (scope of exigent circumstances as applied to automobile searches); State v. Chrisman, 100 Wash.2d 814, 676 P.2d 419 (1984) (scope of search incident to arrest).
¶ 45 The reasonableness clause of the Fourth Amendment permits a balancing approach as an alternative to a warrant under a broader range of circumstances than does article I, section 7. State v. Chenoweth, 160 Wash.2d 454, 463-64, 158 P.3d 595 (2007). Thus, in Vernonia School District 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995), a majority of the United States Supreme Court reasoned that a random, suspicionless drug test would be better than a suspicion-based test as a policy matter, not that an individualized suspicion requirement was unworkable in the school context. Instead of examining the impracticality of a suspicion-based search, the Court asked only whether the government's interest was important enough to justify the privacy invasion at issue. And in Board of Education of Independent School District No. 92 v. Earls, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002), the Supreme Court expanded the special needs exception even further. Rather than requiring that a school demonstrate an actual problem with student drug abuse, the Court essentially took judicial notice of the issue, observing that the "war against drugs" is a "pressing concern" in every school. Id. at 834, 122 S.Ct. 2559. Moreover, the court justified suspicionless drug testing for the purpose not of protecting others, but of protecting the drug-abusing student from his or her own illicit conduct. Id. at 836, 122 S.Ct. 2559.
¶ 46 In contrast to the Fourth Amendment, article I, section 7 protects privacy interests without express limitation and exceptions to the warrant requirement must be narrowly applied. Chenoweth, 160 Wash.2d at 463-64, 158 P.3d 595. In particular, a warrant exception applies only when the reason for the search "fall[s] within the scope of the reason for the exception." Ladson, 138 Wash.2d at 357, 979 P.2d 833 (article I, section 7 prohibits pretextual traffic stops); see also Houser, 95 Wash.2d at 154, 622 P.2d 1218 (inventory searches must be conducted in "good faith," not as a pretext for criminal investigation). Thus, article I, section 7 does not necessarily require us to follow the lead of the United States Supreme Court in expanding the scope of the special needs exceptions to encompass a broad range of applications where the State has failed to establish the traditional requirement of individualized suspicion is impracticable.
¶ 47 As Justice O'Connor stated in her forceful dissent in Acton:
[A] suspicion-based search regime is not just any less intrusive alternative; the individualized suspicion requirement has a *1010 legal pedigree as old as the Fourth Amendment itself, and it may not be easily cast aside in the name of policy concerns. It may only be forsaken, our cases in the personal search context have established, if a suspicion-based regime would likely be ineffectual.
Acton, 515 U.S. at 678, 115 S.Ct. 2386 (O'Connor, J., dissenting).
¶ 48 A requirement of individualized suspicion may be unworkable because the purpose of the search is so unrelated to criminal activity as to render the concepts of probable cause and reasonable suspicion inapt. See, e.g., Acrey, 148 Wash.2d at 748-49, 64 P.3d 594 (individualized suspicion not required when police officers are engaged in noncriminal, noninvestigative "community caretaking functions"); O'Hartigan v. Dep't of Pers., 118 Wash.2d 111, 119-20, 821 P.2d 44 (1991) (allowing suspicionless polygraph testing to evaluate honesty and integrity of Washington State Patrol applicants). Alternately, individualized suspicion may be unworkable because the object of the search is hidden or latent, or otherwise presents inadequate opportunities for detection. Von Raab, 489 U.S. at 674, 109 S.Ct. 1384 (lack of opportunities to observe armed field agents responsible for interdicting drugs); United States v. Davis, 482 F.2d 893 (9th Cir.1973) (airport searches); Downing v. Kunzig, 454 F.2d 1230, 1233 (6th Cir.1972) (allowing suspicionless searches upon entrance to federal courthouse; requiring individualized suspicion "would as a practical matter seriously impair the power of government to protect itself against ruthless forces bent upon its destruction").
¶ 49 In deciding whether individualized suspicion is unworkable, courts consider both the opportunities for developing the requisite individualized suspicion and the severity of the consequences that may ensue by failing to detect illicit conduct. Thus, in Skinner, 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639, the Supreme Court upheld suspicionless drug testing for train operators involved in a train wreck, taking into account the chaos following a serious rail accident, the ephemeral nature of the evidence to be obtained, and the magnitude of the danger to public safety posed by drug or alcohol impaired railway workers. Likewise, in Von Raab, 489 U.S. at 668, 109 S.Ct. 1384, the Court concluded suspicion-based drug testing of customs officials would be unworkable considering such employees often work unsupervised, carry firearms, and are the "first line of defense" against breaches of our national borders. See also Martinez-Fuerte, 428 U.S. at 557, 96 S.Ct. 3074 (suspicion-based traffic stops in border areas unworkable because flow of traffic impedes observation).
¶ 50 Some courts have found the special needs exception applicable in the context of locker searches or metal detectors for the purpose of protecting students from violence in the schools. For example, the Wisconsin Supreme Court permitted random locker searches for the purpose of deterring students from bringing weapons to school in response to a series of gun-related incidents that created "`an atmosphere of tension and fear.'" In re Interest of Isiah B., 176 Wis.2d 639, 642, 500 N.W.2d 637, cert. denied, 510 U.S. 884, 114 S.Ct. 231, 126 L.Ed.2d 186 (1993). Similarly, the California Court of Appeals approved suspicionless searches using metal detectors for the purpose of keeping weapons off campus. In re Latasha W., 60 Cal.App.4th 1524, 70 Cal.Rptr.2d 886 (1998). In finding a requirement of individualized suspicion unworkable, the California court reasoned that schools have "no feasible way to learn that individual students have concealed guns or knives on their persons, save for those students who brandish or display the weapons. And, by the time weapons are displayed, it may well be too late to prevent their use." Id. at 1527, 70 Cal. Rptr.2d 886; see also People v. Dukes, 151 Misc.2d 295, 580 N.Y.S.2d 850 (Crim.Ct.1992) (approving suspicionless searches of high school students using a metal detector for purposes of deterring students from bringing weapons to school).
¶ 51 In this case the school has failed to show a suspicion-based testing regime is not a feasible means of maintaining student order, discipline, and safety. Students, unlike train operators, customs officials, or highway motorists, are under almost constant surveillance by teachers, coaches, peers, and others. *1011 Drug and alcohol use often involves observable manifestations that would supply the particularized suspicion necessary to support a search. Cf. Von Raab, 489 U.S. at 674, 109 S.Ct. 1384 (finding a suspicion-based search unworkable where field officers are not subject to daily supervision); United States v. Edwards, 498 F.2d 496, 500 (2d Cir.1974) (suspicion-based searches of airline passengers unworkable where profile-method of detection is unreliable).
¶ 52 Moreover, the record is devoid of evidence that drug use actually interferes with the school's ability to maintain order, discipline, and student safety. Cf. Acton, 515 U.S. at 649, 115 S.Ct. 2386 (discipline problems caused by rampant drug use; student athletes the "leaders of the drug culture"; open use of drugs); Skinner, 489 U.S. at 606-07, 109 S.Ct. 1402 (high percentage of railway workers are problem drinkers). The school's statistical evidence of drug use by students does not adequately establish a special need for suspicionless testing. See City of Seattle v. Mesiani, 110 Wash.2d 454, 458 n. 1, 755 P.2d 775 (1988) (finding statistical probability that sobriety checkpoints will intercept drug-impaired motorists inadequate to justify suspicionless investigative stops).
¶ 53 If drug use does not result in observable manifestations that adversely impact the school's ability to provide a safe, orderly environment, the school's interest in detecting drug use does not justify nonconsensual drug testing.[1] On the other hand, if drug use is an actual problem, school officials likely will have the individualized suspicion necessary to require a drug test, particularly given the relaxed standard of suspicion applicable in the school context. See McKinnon, 88 Wash.2d at 81, 558 P.2d 781. Thus, it is difficult to see how a suspicionless drug testing program is necessary.
¶ 54 In addition, the record shows that the selection of student athletes was not because athletes as a class are responsible for drug-related harm, as in Acton (athletes were leaders of the drug culture, responsible for discipline problems), but because they had reduced expectations of privacy vis-a-vis the other students, making it more likely the district's drug-testing program would pass constitutional muster. Nothing in the record suggests athletes account for a disproportionate number of drug users or that drug-related sports injury is a particular problem. Article I, section 7 does not permit the pretextual use of a warrant exception. Ladson, 138 Wash.2d 343, 979 P.2d 833; cf. Whren v. United States, 517 U.S. 806, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996); Stroud, 106 Wash.2d 144, 720 P.2d 436; cf. New York v. Belton, 453 U.S. 454, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).
¶ 55 Even if the district could demonstrate that a suspicion-based testing regime is unworkable, the balance of interests at stake weighs against allowing suspicionless drug testing, taking into account the student's privacy interest, the nature of the intrusion, and its limited efficacy as compared with a search regime based on individualized suspicion.
¶ 56 First, as to the interest involved, student athletes undoubtedly have a strong privacy interest in their excretory functions. A state-compelled urine test is "particularly destructive of privacy and offensive to personal dignity." Von Raab, 489 U.S. at 680, 109 S.Ct. 1384 (Scalia, J., dissenting). In Acton, the Court found urine testing a minimal intrusion in view of the diminished expectations of privacy held by student athletes, who undress and shower in communal locker rooms. Although students generally have a diminished expectation of privacy in the school setting, the privacy interests of student athletes are not substantially lower than those of students in general. Most students, *1012 not just athletes, must share communal locker rooms (physical education classes) and restroom facilities. However, it is difficult to understand how the necessity to share locker rooms and restrooms diminishes a student's expectation that their excretory functions will not be subject to governmental intrusion absent particularized suspicion of wrongdoing.
¶ 57 Next, considering the nature of the intrusion, the Earls court reasoned that compelled urine testing is minimally intrusive, stating "the invasion of students' privacy is not significant." Earls, 536 U.S. at 834, 122 S.Ct. 2559. This dubious premise is inconsistent with Washington law. Certainly monitored urine collection and urine testing is more intrusive than the pat-down search or brief interrogative stop that we have found highly intrusive in the past. See Mesiani, 110 Wash.2d at 458, 755 P.2d 775 (finding brief interrogative stop of highway travelers "highly intrusive"); Jacobsen v. City of Seattle, 98 Wash.2d 668, 673, 658 P.2d 653 (1983) (characterizing a pat-down search of concert-goers as a "high degree of intrusion"); cf. Surge, 160 Wash.2d at 78-79, 156 P.3d 208 (compelled DNA blood testing of convicted felons is not highly intrusive in view of diminished privacy interests and limitations on use).
¶ 58 A suspicionless testing regime must also be likely to actually accomplish its goals. One of the district's goals is to protect student athletes who may be harmed by those who engage in athletic competitions while impaired by drugs. But testing a student athlete weeks or months before an athletic event does little to prevent that from happening. A urine test remote in time from the event does not detect present drug use that might affect performance. In contrast, the school could intercept those most likely to pose a threat to others by applying a suspicion-based drug-testing policy at the time of the athletic competition.
¶ 59 Another goal of the drug-testing program is general deterrence of drug use by students. Yet by focusing on student athletes, the school has targeted a group less likely to use drugs than students generally. Moreover, a student who wishes to continue using drugs merely needs to forego participation in athletic activities. As pointed out by the Washington Education Association and Drug Policy Alliance in their amicus brief, drug testing may actually be counterproductive, as participation in athletic activities is itself an important factor in discouraging drug use and the drug testing program may actually discourage such participation, isolating students from healthy activities. The district has failed to show that suspicionless drug testing would be significantly more effective in achieving its stated goals than a suspicion-based regime. The limited effectiveness of the drug testing policy does not justify the indignity visited upon students who must submit to it. Indeed, suspicionless drug testing jeopardizes other important educational objectives, including preparing students to become responsible citizens who share a common understanding and appreciation of our constitutional values.
¶ 60 On this record the district has failed to demonstrate that its suspicionless drug testing program justifies application of the special needs doctrine.

Conclusion
¶ 61 The majority errs in categorically rejecting the special needs exception to the warrant requirement. Under limited circumstances, a suspicionless search may be permissible when the requirement of individualized suspicion would jeopardize an important governmental interest beyond the ordinary interest in law enforcement. The special needs exception is consistent with well-established common law principles governing warrantless searches and, thus, comports with article I, section 7. However, while I believe there may be circumstances that justify suspicionless drug testing of students, I agree that this case does not present them. Thus, I concur in the result.
WE CONCUR: CHARLES W. JOHNSON, MARY E. FAIRHURST, JJ., BOBBE J. BRIDGE, J. Pro Tem.
CHAMBERS, J. (concurring).
¶ 62 I concur fully in the well reasoned majority opinion. I write separately to observe that on this day a majority of my *1013 colleagues has found a greater privacy interest in a person's urine than they recently found in a person's saliva and the DNA (deoxyribonucleic acid) it contains. See State v. Athan, 160 Wash.2d 354, 374, 158 P.3d 27, 37 (2007); cf. State v. Surge, 160 Wash.2d 65, 156 P.3d 208 (2007). I find the juxtaposition of these two opinions paradoxical.
J.M. JOHNSON, J. (concurring).
¶ 63 I concur with the majority's holding that the random suspicionless drug testing of middle and high school athletes as conducted in this case is not constitutional. The majority correctly notes that "[t]he question before us is narrow," and its analysis is limited to this particular drug testing program. Majority at 999. I write to emphasize, however, that a minor student's right to privacy, in the secondary school context, is not absolute and thus not all drug testing programs are invalid. After all, a middle and high school drug testing program does not impinge on the jealously guarded private affairs of adult citizens, but on those of adolescents, whose privacy expectations and rights are not the same as those of adults.[1]
¶ 64 Washington's constitution and laws necessarily recognize the special situation in public schools based on the age of students and the fact it is constitutionally the "paramount duty of the state" to provide for the education of minors. WASH. CONST. art. IX, § 1. Thus, a school drug testing program based on individualized reasonable suspicion offends neither the United States Constitution Amendment IV nor article I, section 7 of the Washington Constitution. Under carefully defined circumstances, a random suspicionless drug testing program for high school student athletes, in my opinion, might also be implemented that will meet applicable constitutional requirements.[2]

STANDARD OF REVIEW
¶ 65 When resolving a question of first impression concerning the scope of article I, section 7, we may consider well-reasoned precedents from federal courts and sister jurisdictions. See State v. Chenoweth, 160 Wash.2d 454, 470-71, 158 P.3d 595 (2007) (citing State v. Murray, 110 Wash.2d 706, 709, 757 P.2d 487 (1988)). Although not binding on this court, such precedents may provide persuasive authority and analysis. Id. at 471, 158 P.3d 595 (citing City of Seattle v. Mighty Movers, Inc., 152 Wash.2d 343, 356, 96 P.3d 979 (2004)).

ANALYSIS
A. Defining The Nature of a Secondary Student's Privacy Interest
¶ 66 First, we must consider a high school student's asserted privacy interest. The United States Supreme Court has repeatedly held that school children do retain some rights but do not enjoy the full extensive constitutional protections of adults in our society. If school children had all the same rights as adults, the administration of our schools would creak to a halt under the twin burdens of due process and probable cause. For example, a teacher-ordered school detention would cease to be an effective disciplinary measure and instead be converted into a lawsuit for tortious imprisonment.
¶ 67 Although Washington's Constitution does contain an enhanced right of privacy in article I, section 7, this strict provision was written by our founders with the understanding that the affairs of school children are not so private as those of adults and may be treated differently from those of adults.[3] *1014 Common sense dictates this outcome and our jurisprudence supports it.
¶ 68 The separate and important constitutional provision in article IX that basic (K-12) education "is the paramount duty of the state" also supports the conclusion of lower privacy expectations for school children. WASH. CONST. art. IX, § 1. A student in a regulated educational environment, where the school stands in loco parentis, clearly does not have the same reasonable expectation of privacy as an adult. The majority acknowledges this proposition: "[g]enerally we have recognized students have a lower expectation of privacy because of the nature of the school environment." Majority at 1002. School districts have the statutory authority and responsibility to maintain order and discipline in their schools and to protect the health and safety of their students.[4] In my view, the majority does not fully recognize the necessary corollary; school districts are allowed tools and programs to combat rising drug problems and to fulfill their responsibility as protector of students.
¶ 69 Additionally, in addressing the nature of these student's privacy interests, we should recognize that athletes, whether at the middle school, high school, college, or professional level, have a lower expectation of privacy.[5] Secondary school athletes here, with their parents' consent, have voluntarily subjected themselves to rules and regulations that are not enforced against the general student body. The record shows, for example, these students (also with their parents' consent) who play sports in Wahkiakum District agree to an annual invasive physical examination to determine their health status before participating. Indeed, the appellants conceded at argument that these examinations are valid requirements by schools. Wash. State Supreme Court oral argument at 8:50, York v. Wahkiakum Sch. Dist. No. 200, No. 78946-1 (May 8, 2007), audio recording by TVW, Washington State's Public Affairs Network, available at http://www.tvg. org. As the Court in Vernonia School District 47J v. Acton, 515 U.S. 646, 657, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) observed, "[s]chool sports are not for the bashful. They require `suiting up' before each practice or event, and showering and changing afterwards. Public school locker rooms, the usual sites for these activities, are not notable for the privacy they afford." The majority acknowledges that male athletes at Wahkiakum High School have less expectation of privacy "since there are no dividers between urinals, or between the showers, and athletes routinely undress in each other's presence." Majority at 1002 n. 8. "Somewhat like adults who choose to participate in a `closely regulated industry,' students who voluntarily participate *1015 in school athletics have reason to expect intrusions upon normal rights and privileges, including privacy." Acton, 515 U.S. at 657, 115 S.Ct. 2386; see Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 627, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); United States v. Biswell, 406 U.S. 311, 316, 92 S.Ct. 1593, 32 L.Ed.2d 87 (1972).
¶ 70 The nature of athletic competition also supports the conclusion that athletes have a lower expectation of privacy in regards to drug testing. Athletes face enormous pressure to excel in competition and may turn to performance-enhancing drugs such as steroids.[6] Taking performance-enhancing drugs, or "doping," is not only dangerous to the user, but potentially to out-matched opponents. Such drugs also undermine the integrity of athletic competitions. Even the taking of recreational drugs while playing sports raises safety issues. Certain drugs may keep athletes from awareness of pain from injury, allowing severe  even career-ending or life-threatening  problems. The Acton Court recognized that in athletic competitions, "the risk of immediate physical harm to the drug user or those with whom he is playing his sport is particularly high." 515 U.S. at 662, 115 S.Ct. 2386. Justice Ginsburg in her dissent in Board of Education of Independent School District No. 92 v. Earls, 536 U.S. 822, 846, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002), similarly noted that "[s]chools regulate student athletes discretely because competitive school sports . . . expose students to physical risks that schools have a duty to mitigate." The legislature has expressly entrusted school districts with responsibility "to control, supervise and regulate the conduct of interschool athletic activities. . . ." RCW 28A.600.200. Our constitution allows school districts adequate avenues for proper programs to fulfill these responsibilities and to thereby protect students and avoid potential school liability.
B. Is There an Intrusion into Private Affairs of Students?
¶ 71 Even in light of the lower privacy interest of students and the even lower privacy interest of minors as student athletes, there is little doubt that requiring this urinalysis test is a significant invasion of privacy. In Robinson v. City of Seattle, 102 Wash. App. 795, 818, 10 P.3d 452 (2000), the Court of Appeals opined that "[i]t is difficult to imagine an affair more private than the passing of urine." The United States Supreme Court similarly observed in reference to urination, "`[m]ost people describe it by euphemisms if they talk about it at all. It is a function traditionally performed without public observation; indeed, its performance in public is generally prohibited by law as well as social custom.'" Skinner, 489 U.S. at 617, 109 S.Ct. 1402 (quoting Nat'l Treasury Employees Union v. Von Raab, 816 F.2d 170, 175 (5th Cir.1987), aff'd in part and vacated in part, 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989)).
¶ 72 There is "no doubt that the privacy interest in the body and bodily functions is one Washington citizens have held, and should be entitled to hold, safe from governmental trespass." Robinson, 102 Wash.App. at 819, 10 P.3d 452. As an indisputable invasion of privacy,[7] requiring a urinalysis test without probable cause of drug use must be authorized by the authority of law under our constitution.
C. Does Washington Recognize a Special Needs Exception in Schools?
¶ 73 We now turn to whether there is a special needs exception to the constitutional authority of law requirement. In Washington, warrantless searches of free adults are per se unreasonable unless fitting within one of the "`jealously and carefully drawn' exceptions." State v. Hendrickson, 129 Wash.2d 61, 70, 917 P.2d 563 (1996) (internal quotation marks omitted) (quoting State v. Houser, 95 *1016 Wash.2d 143, 149, 622 P.2d 1218 (1980)); see also majority at 1002-03. However, where the state demonstrates a "special need," the "authority of law" requirement may be satisfied in select cases. Washington common law recognizes "special needs" in certain areas and has impliedly identified a "special environment" in public schools, albeit different from that recognized by federal courts.
¶ 74 Blood testing is arguably more invasive than urinalysis, yet we have held that those convicted of sexual crimes (or in the case of juveniles, those adjudicated to have committed sexual offenses) can be tested for HIV due to a special need. See In re Juveniles A, B, C, D, E, 121 Wash.2d 80, 847 P.2d 455 (1993); see also State v. Olivas, 122 Wash.2d 73, 856 P.2d 1076 (1993) (warrantless blood tests of violent and sex offenders are valid under both the United States and Washington Constitutions). Additionally, in State v. Curran, 116 Wash.2d 174, 804 P.2d 558 (1991) (abrogated on other grounds by State v. Berlin, 133 Wash.2d 541, 548, 947 P.2d 700 (1997)), this court held that blood testing a motorist for intoxication does not violate article I, section 7 if the test is performed in a reasonable manner and there is an indication that it would reveal evidence of intoxication. While the Court of Appeals in Robinson, 102 Wash.App. at 813 n. 50, 10 P.3d 452, recognized that Washington offers higher protection for bodily functions compared to the federal courts, that same court held that the City of Seattle could test those individuals responsible for public safety for drug use without a warrant or individualized suspicion. Id. at 827-28, 10 P.3d 452. This court has not addressed such programs.
¶ 75 In State v. Surge, 160 Wash.2d 65, 156 P.3d 208 (2007), we allowed warrantless DNA sampling of prisoners without individualized suspicion. The majority observes that students are not convicted criminals. Majority at 1005. This is true but not determinative. Clearly, the definitions of constitutional protection and the privacy expectations ("private affairs") are different between students and criminals. These distinctions do not determine the entire constitutional analysis, but both groups do have a lowered reasonable expectation of privacy. See Charles W. Johnson, Survey of Washington Search and Seizure Law: 2005 Update, 28 SEATTLE U.L.REV. 467, 687 (2005) (recognizing a "special environments" category of searches applicable to public schools, prisons, the international border, and administrative searches). The current statute providing for search of school lockers exemplifies the lower expectation of privacy recognized in schools. RCW 28A.600.220 specifically states:
No right nor expectation of privacy exists for any student as to the use of any locker issued or assigned to a student by a school and the locker shall be subject to search for illegal drugs, weapons, and contraband as provided in RCW 28A.600.210 through 28A.600.240.
¶ 76 This statute is just one example of the special environment that Washington has recognized in the school setting.[8] Although the parameters of the public school special environment have not been clearly defined in all areas, the following section concludes a drug testing program based on individualized suspicion is sustainable under article I, section 7.
D. Individualized Suspicion Justifies Testing
¶ 77 The United States Supreme Court's jurisprudence holds that the Fourth Amendment, with its "unreasonable search" protections, allows public schools to randomly drug test student athletes. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564; Earls, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735. I agree with the majority that the protections of article I, section 7 are greater. I find *1017 persuasive a prior case in that Court that required individualized suspicion before the search could take place, thereby articulating a standard more deferential to privacy rights (more analogous to our constitution's). See New Jersey v. T.L.O., 469 U.S. 325, 341, 105 S.Ct. 733, 83 L.Ed.2d 720 (1985).
¶ 78 In my opinion, the T.L.O. deferential standard for suspicion searches could pass Washington's stricter privacy test. As mentioned infra note 3, article I, section 7 and the Fourth Amendment are structurally different and the Washington Constitution protects "private affairs" and not only against "unreasonable searches." Still, the T.L.O. reasoning is persuasive because it balances the privacy rights of minor students and the administrative responsibilities of school officers.
¶ 79 The T.L.O. Court reasoned that searches in a school environment are analogous to those conducted in a similar administrative context, relying on its previous analysis in Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967). See T.L.O., 469 U.S. at 340-41, 105 S.Ct. 733. The T.L.O. Court held that school teachers and administrators could initiate a search if: (1) there existed "reasonable grounds for suspecting that the search will turn up evidence that the student has violated or is violating either the law or the rules of the school"; and (2) the search is "not excessively intrusive in light of the age and sex of the student and the nature of the infraction." Id. at 342, 105 S.Ct. 733. The Washington Legislature adopted our current statute governing searches of students and students' possessions that mirrors this "reasonable grounds" test from T.L.O. RCW 28A.600.230.[9]
¶ 80 In Acton, the majority took issue with the T.L.O. Court's use of individualized suspicion, arguing that requiring individualized suspicion would interfere with the school's drug prevention goals and possibly worsen the situation. See 515 U.S. at 663-64, 115 S.Ct. 2386 (suggesting that teachers and school officials are not trained to detect drug use, teachers might claim any problematic student is using drugs, using individualized suspicion would turn the drug testing process into a badge of shame, and individualized suspicion creates a needless loss of resources in defending against claims of arbitrary imposition). Justice O'Connor in her forceful dissent in Acton, however, addressed the effectiveness of a drug program based on reasonable suspicion:
[N]owhere is it less clear that an individualized suspicion requirement would be ineffectual than in the school context. In most schools, the entire pool of potential search targets  students  is under constant supervision by teachers and administrators and coaches, be it in classrooms, hallways, or locker rooms.
. . . The great irony of this case is that most (though not all) of the evidence the District introduced to justify its suspicionless drug testing program consisted of first- or second-hand stories of particular, identifiable students acting in ways that plainly gave rise to reasonable suspicion of in-school drug use  and thus that would have justified a drug-related search under our T.L.O. decision.
Id. at 678-79, 115 S.Ct. 2386 (O'Connor, J., dissenting) (citation omitted).
¶ 81 The implementation of a school drug testing program based on individualized suspicion is undoubtedly improved with training of teachers, counselors, and/or staff to detect *1018 signs of drug use. Many drugs have easily recognizable physical manifestations: glazed appearance of eyes, dilated pupils, slurred speech, distinct odors on breath, etc.[10] Justice O'Connor observed in her dissent in Acton:
Schools already have adversarial, disciplinary schemes that require teachers and administrators in many areas besides drug use to investigate student wrongdoing (often by means of accusatory searches); to make determinations about whether the wrongdoing occurred; and to impose punishment. To such a scheme, suspicion-based drug testing would be only a minor addition.
515 U.S. at 677, 115 S.Ct. 2386 (O'Connor, J., dissenting).
¶ 82 Justice O'Connor also emphasized that, "The [majority's] fear that a suspicion-based regime will lead to the testing of `troublesome but not drug-likely' students . . . ignores that the required level of suspicion in the school context is objectively reasonable suspicion." Id. at 676-77, 115 S.Ct. 2386 (O'Connor, J., dissenting). In State v. McKinnon, 88 Wash.2d 75, 81, 558 P.2d 781 (1977), this court outlined factors relevant to determining whether a school official in fact had reasonable suspicion: "the child's age, history, and school record, the prevalence and seriousness of the problem in the school to which the search was directed, the exigency to make the search without delay, and the probative value and reliability of the information used as a justification for the search."
¶ 83 Admittedly, a drug program based only on individualized reasonable suspicion is not without problems, but such a program would result in a greater protection of constitutional rights.[11] Furthermore, a program based on individualized reasonable suspicion might often provide more deterrence to student drug use than a random suspicionless program. Under a random regime, students might take their chances that they will not be one of the very few unlucky students selected for drug testing. But under a reasonable suspicion regime, if students show signs of drug use, there is a higher probability of getting tested. As in Acton, "there is a substantial basis for concluding that a vigorous regime of suspicion-based testing . . . would have gone a long way toward solving [the District's] school drug problem while preserving the Fourth Amendment rights of [students]." 515 U.S. at 679-80, 115 S.Ct. 2386 (O'Connor, J., dissenting).
¶ 84 Thus, the United States Supreme Court and prior cases in this court have held that requiring "reasonable" or "individualized" suspicion before commencing a search is sufficient to protect a student's right to privacy and still allow school officials to do their job. T.L.O., 469 U.S. at 341-42, 105 S.Ct. 733; McKinnon, 88 Wash.2d at 81, 558 P.2d 781 ("We hold that the search of a student's person is reasonable and does not violate his Fourth Amendment rights, if the school official has reasonable grounds to believe the search is necessary in the aid of maintaining school discipline and order."). While McKinnon was decided before Acton, we have never revisited the case and it remains a correct statement of Washington law. See also State v. Slattery, 56 Wash. App. 820, 823, 787 P.2d 932 (1990) ("Under the school search exception, school officials may search students if, under all the circumstances, the search is reasonable."); State v. B.A.S., 103 Wash.App. 549, 554 n. 8, 13 P.3d 244 (2000) (specifically adopting a reasonableness search standard).
¶ 85 Thus, our decisions allow a reasonable search or test using the T.L.O. individualized reasonable suspicion standard. The legislature could further define the factors to be considered by law in a similar fashion as they have previously specified school interests in statute. For example, RCW 28A.600.210 notes the important policy considerations favoring a reasonable search standard and applies *1019 that standard to school lockers.[12]
¶ 86 A student may be drug tested if a coach or school administrator can articulate a reasonable suspicion of drug use. In my view, Washington has implicitly accepted this view of private affairs through a special environments exception under article I, section 7.
E. Random Suspicionless Drug Testing of Athletes
¶ 87 Although I believe that the random testing program as conducted here was invalid, I do not think that random suspicionless drug testing of middle and high school athletes is categorically unconstitutional even under Washington's protective constitution article I, section 7.[13] Many drugs, especially performance-enhancement drugs, present substantial risks but are not easily detected under an individualized reasonable suspicion scheme. Some physical manifestations of these drugs, e.g., increase in muscle mass and acne, also occur naturally among some high school and middle school students.[14] As mentioned infra, drug use among athletes not only affects the integrity of athletic competition but also entails safety concerns not inherent in other activities and for which the district has some responsibility. A steroid or methamphetamine-using athlete may pose both a much higher risk of harm to himself and threat of injury to others, including his opponents.
¶ 88 Although random suspicionless drug testing is a significant invasion of privacy, the privacy expectations of minor school students, of minor student athletes, are less than those of adults. Under certain circumstances, the balance between the government's interest in suspicionless drug testing and student athletes' privacy rights might weigh in favor of testing. It is premature, and the record is insufficient, to articulate the specific circumstances when a suspicionless test would be upheld. We leave the important issue unresolved.[15] The Washington Legislature may be the appropriate place to consider this issue at length; the drug testing arena would benefit from legislative consideration and fact finding.
¶ 89 In my view, a constitutional program of random suspicionless drug testing of student athletes should advance compelling interests, show narrow tailoring, and employ a less intrusive method of testing.[16] The United States Supreme Court in Acton recognized the test for a compelling interest is not some "fixed, minimum quantum of governmental concern" but rather whether the government's interest is "important enough" to justify the specific invasion of the constitutional right at issue. 515 U.S. at 661, 115 S.Ct. 2386 (emphasis omitted). (Though Acton discusses the different federal constitutional protections, this test is also appropriate under our constitution's enhanced privacy protections.) Thus, the greater the intrusion into constitutional rights, the more compelling *1020 the interests must be. Since we have established that random mandatory urinalyses here are significant invasions of privacy,[17] even of minor students, the standard to prove compelling interest is high, although not impossible.
¶ 90 The Acton Court noted that the importance of deterring drug use by our nation's school children can hardly be doubted. Acton, 515 U.S. at 661, 115 S.Ct. 2386. I agree. But in addition to evidencing a general drug problem among minor students nationally, findings of a local school drug problem are likely required to meet the compelling threshold. Some factors relevant to determining whether a compelling interest in suspicionless drug testing of athletes exists include an abnormally high rate of or a sharp increase in drug use, and a higher drug rate or impact among athletes. In Acton, there was even evidence that the athletes were the "leaders of the drug culture." 515 U.S. at 649, 115 S.Ct. 2386. Objective evidence of the school's drug problem, through student surveys or reports by teachers and other school officials of student drug use, and also evidence of the drug problem's effect on the functioning of the school might prove compelling.[18]
¶ 91 Although the Supreme Court in Earls, 536 U.S. at 836, 122 S.Ct. 2559, suggested that it makes little sense to insist a drug problem become severe before it is addressed, that is not proposed for our schools. Drug problems can be addressed early through means other than suspicionless drug testing. Because of its invasive nature, alternative programs such as individualized suspicion possibly may need to be supplemented by a proper program of random suspicionless drug testing.
¶ 92 Narrow tailoring is also likely required. There must be a close fit between the testing proposed and the drug problem. Determining whether the tailoring is sufficiently narrow requires looking beyond the formal justification to the actual reason for the drug testing program.[19]
¶ 93 Although Wahkiakum District did present evidence of a school-wide drug problem, there was no showing that athletes used drugs at a higher rate than other students or that testing the athletes would address the drug problem among the general student body. CP at 486 (the district alleged only that "athletes are involved in the use of illegal drugs and alcohol at least to the same level as are non-athletes.") The district also acknowledged that there is "no evidence that student athletes were leaders in [any] `drug culture' in its school." CP at 25, ¶ 1.119; cf. Acton, 515 U.S. at 649, 115 S.Ct. 2386. In the instant case, the district subjected the athletes to random suspicionless testing not because of a higher incidence of drug use, but merely because athletes have lower expectation of privacy. Wahkiakum's random suspicionless drug program was not narrowly tailored to a compelling government interest.
¶ 94 Although some federal courts seem unconcerned with the indignity of urine collection, Washington courts recognize our heightened protections from Washington Constitution's article I, section 7 explicit safeguard for "private affairs." See Acton, 515 U.S. at 664, 115 S.Ct. 2386; Robinson, 102 Wash.App. at 822, 10 P.3d 452 (decrying that "all of the citizens who apply for employment . . . must submit to a humiliating procedure in order for the City to learn the chemical content of their urine"). As this case indicates, how a drug test is administered is one important aspect of its constitutionality and a showing of a less intrusive method should be required. See, e.g., Jacobsen v. City of Seattle, 98 Wash.2d 668, 675, 658 P.2d 653 (1983) (finding warrantless pat-down searches of patrons attending rock concerts unconstitutional but noting that "the City might establish less instrusive and more formal procedures for determining the presence of contraband"). Wahkiakum District's drug *1021 program was more intrusive and humiliating than necessary to achieve its stated goals. A randomly selected student athlete was publicly removed from class, sometimes by having his or her name called over the intercom, and transported by a school official to the Wahkiakum County Health Department for a sample. CP at 39, 91. Although the urine sample was given in a closed bathroom stall, a health department employee stood outside the stall aurally monitoring the process. CP at 39-40.
¶ 95 There are less intrusive ways of conducting a drug test. Schools (or the legislature) might even consider other technology for drug testing such as saliva samples or sweat patches, which are significantly less intrusive and humiliating.[20]

CONCLUSION
¶ 96 I concur with the majority's decision in striking down this drug testing program given the record in this particular case. Washington's public schools already have the authority to engage in drug testing where based on individualized reasonable suspicion, and such a program is fully constitutional. I conclude that random suspicionless drug testing may also be devised and conducted under carefully defined circumstances. The legislature may be the appropriate body to consider such a program, I concur.
NOTES
[1] Article I, section 7 of the Washington Constitution provides:

No person shall be disturbed in his private affairs, or his home invaded, without authority of law.
[2] Originally, the school district planned to test any student involved in extracurricular activities but later confined the testing only to student athletes.
[3] If a student athlete receives a positive result and believes the result is wrong, he or she may submit a list of prescription medications or past medical history to explain the false positive. This information is transmitted to the health department employee and not to the school district. The York and Schneider parents seem to press the argument the district's policy requires all students to reveal their medications. The trial court found, however, "the policy clearly does not require disclosure of other medications in the first instance. It is only if a positive result is obtained that a student must decide whether or not to reveal other medications or forfeit his or her right to participate in extracurricular activities." CP at 487-88 (Court's Mem. Decision, Disputed Facts).
[4] The York and Schneider parents abandoned one of their original claimsthe policy also violated the Fourth Amendment to the United States Constitutionin light of the Supreme Court's decisions in Acton and Earls. Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 115 S.Ct. 2386, 132 L.Ed.2d 564 (1995) (holding random drug testing of public school athletes is permissible); Bd. of Educ. v. Earls, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735 (2002) (holding random drug testing of any public school student involved in an extracurricular activity is permissible).
[5] The federal special needs exception is discussed, infra, in part II, section 1.
[6] Professor Wayne LaFave criticizes the majority's defense of suspicionless searches: "The most objectionable aspect of this passage . . . is the violence that it does to established Fourth Amendment doctrine. The Acton majority treats random testing and testing upon reasonable suspicion as being essentially the same, perhaps slightly different in degree, but not different in kind. But in point of fact, the two are quite different in kind, which is why the Supreme Court and the lower courts had theretofore required at least individualized suspicion to justify a search, except in exceedingly rare instances in which circumstances much more compelling than those in the instant case were present." 5 WAYNE R. LAFAVE, SEARCH AND SEIZURE: A TREATISE ON THE FOURTH AMENDMENT § 10.11(c), at 516 (4th ed.2004) (footnotes omitted).
[7] The Court then expanded on Acton and allowed random drug testing of students participating in extracurricular activities of any kind. Earls, 536 U.S. 822, 122 S.Ct. 2559, 153 L.Ed.2d 735.
[8] Specifically, the Washington Interscholastic Activities Association requires all member schools to adopt rules to discourage use of drugs and alcohol. CP at 112. Also, all student athletes must undergo a physical examination prior to participating in athletics. Id. at 111. The school district also points out the male athletes at Wahkiakum High School should expect even less privacy since there are no dividers between urinals, or between the showers, and athletes routinely undress in each other's presence.
[9] Furthermore, even the United States Supreme Court has apparently put less emphasis on these arguments as they now allow public school districts to randomly drug test any student engaged in any extracurricular activity. Earls, 536 U.S. at 831, 122 S.Ct. 2559 (stating it was not dispositive to their analysis in Acton whether the students' expectation of privacy was altered because they were subjected to "regular physicals or communal undress").
[10] A search is reasonable if (1) it is justified at its inception, (2) is reasonably related in scope to the circumstances that justified the search, and (3) there is a nexus between the item sought and the infraction being investigated. State v. B.A.S., 103 Wash.App. 549, 553-54, 13 P.3d 244 (2000).
[11] Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).
[12] The school search cases previously discussed, T.L.O. and Acton, were also decided under the Supreme Court's special needs exception.
[13] As one commentator has noted, "the line between . . . a criminal investigation and . . . searches and seizures designed primarily to serve noncriminal law enforcement goals, is thin and, quite arguably, arbitrary. Yet, it is a line of considerable constitutional significance." JOSHUA DRESSLER, UNDERSTANDING CRIMINAL PROCEDURE 323 (3d ed.2002).
[14] Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); See v. City of Seattle, 387 U.S. 541, 87 S.Ct. 1737, 18 L.Ed.2d 943 (1967); New York v. Burger, 482 U.S. 691, 107 S.Ct. 2636, 96 L.Ed.2d 601 (1987). When the Court balanced the interests in T.L.O., it relied on its analysis of administrative searches promulgated in Camara. T.L.O., 469 U.S. at 341, 105 S.Ct. 733.
[15] United States v. Ramsey, 431 U.S. 606, 616, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977); United States v. Brignoni-Ponce, 422 U.S. 873, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975); Michigan Dep't of State Police v. Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412 (1990).
[16] United States v. Knights, 534 U.S. 112, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001); Griffin v. Wisconsin, 483 U.S. 868, 107 S.Ct. 3164, 97 L.Ed.2d 709 (1987); Hudson v. Palmer, 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984); Bell v. Wolfish, 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).
[17] But the Court has not always allowed drug testing without some individualized suspicion. In Chandler, the Court held a Georgia law requiring candidates for state office pass a drug test was unconstitutional because the Court could not identify a "sufficiently vital" special need to override the candidates' privacy interests. Chandler v. Miller, 520 U.S. 305, 318, 117 S.Ct. 1295, 137 L.Ed.2d 513 (1997). Then in Ferguson the Court held a public hospital could not test any maternity patient suspected of drug use without her consent. Ferguson v. City of Charleston, 532 U.S. 67, 121 S.Ct. 1281, 149 L.Ed.2d 205 (2001). While the ultimate goal"protecting the health of both mother and child"was laudable, the invasion of privacy was more substantial here because positive test results were given to the police for prosecution purposes. Id. at 81, 121 S.Ct. 1281.
[18] Our courts have adopted an approach to administrative searches similar to those enunciated in Camara, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930. Thurston County Rental Owners Ass'n v. Thurston County, 85 Wash.App. 171, 183, 931 P.2d 208 (1997); Murphy v. State, 115 Wash. App. 297, 62 P.3d 533 (2003).
[19] State v. Almanza-Guzman, 94 Wash.App. 563, 972 P.2d 468 (1999) (relying only on federal case law for its border analysis). In State v. Quick, 59 Wash.App. 228, 232, 796 P.2d 764 (1990), the Court of Appeals held probable cause was needed to search persons at places other than the actual border. This is a higher reasonable suspicion standard than that articulated by the United States Supreme Court in Brignoni-Ponce, 422 U.S. at 884, 95 S.Ct. 2574. Also, before the United States Supreme Court decided Sitz, 496 U.S. 444, 110 S.Ct. 2481, 110 L.Ed.2d 412, we held sobriety checkpoints violated both the federal and state constitutions. City of Seattle v. Mesiani, 110 Wash.2d 454, 755 P.2d 775 (1988).
[20] State v. Baker, 28 Wash.App. 423, 623 P.2d 1172 (1981). Our court has recognized a "warrantless search exception, when reasonable, to search a parolee or probationer and his home or effects." State v. Campbell, 103 Wash.2d 1, 22, 691 P.2d 929 (1984) (citing Hocker v. Woody, 95 Wash.2d 822, 826, 631 P.2d 372 (1981)). See also State v. Lucas, 56 Wash.App. 236, 783 P.2d 121 (1989).
[21] Additionally, in Jacobsen v. City of Seattle, 98 Wash.2d 668, 658 P.2d 653 (1983), this court held warrantless patdown searches conducted as a condition admission to concerts at the Seattle Center Coliseum were not allowed. However, the court relied entirely on federal Fourth Amendment cases and not our state constitution.
[1] The school argues that some performance enhancing drugs may be undetectable yet offers no evidence of an actual problem with drug-related sports injuries. The school also argues that detecting the use of performance enhancing drugs is necessary to protect the integrity of athletic events. However, the harm threatened by the unfair use of performance-enhancing drugs is simply not great enough to justify nonconsensual suspicionless drug testing. Cf. Skinner, 489 U.S. at 628, 109 S.Ct. 1402 ("disastrous consequences" of a train wreck); Rushton v. Neb. Pub. Power Dist., 844 F.2d 562 (8th Cir.1988) (danger posed by drug-impaired nuclear power plant operators); Edwards, 498 F.2d 496 (a single hijacked airline can destroy hundreds of lives and millions of dollars of property).
[1] That it was the parents of the minor students who brought this action illustrates one substantial difference between the rights of minors and the rights of adults. Juveniles also have an entirely separate justice system, Title 13 RCW. Violations otherwise criminal if committed by an adult are not criminal if committed by a minor. RCW 13.04.240. Minors are treated differently under many other Washington laws, e.g., contract laws, labor laws, and voting laws. Clearly, the rights of minors are not coextensive with those of adults.
[2] If these juveniles may not be tested, current drug testing for Washington college athletes under NCAA (National College Athletic Association) programs is problematic, since those athletes have the full constitutional protections of adults. See note 5, infra.
[3] United States Constitution Amendment IV declares, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated" whereas Washington Constitution article I, section 7 provides that "[n]o person shall be disturbed in his private affairs, or his home invaded, without authority of law." In addition to being structurally different, the Washington Constitution is notably not based on a reasonableness standard.
[4] In addition to statutory responsibilities for student discipline and safety such as those found in RCW 28A.150.240(2), for example, the Washington Interscholastic Activities Association requires all member schools to adopt rules to discourage use of drugs and alcohol. Clerk's Papers (CP) at 112.
[5] While the issue is not raised in our current case, we should be mindful of possible unintended consequences that may spring from the majority's holding. If secondary school student athletes, with their attendant lower expectation of privacy, are free from random suspicionless drug searches, it follows that college athletes, who assert full constitutional rights, must also be free from random suspicionless drug testing. See Univ. of Colo. ex rel. Regents of Univ. of Colo. v. Derdeyn, 863 P.2d 929, 930 (Colo. 1993) (construing Colorado Constitution article II, section 7 and finding suspicionless searches by the University of Colorado were unconstitutional).

Under the majority's analysis, NCAA testing, which is fairly invasive, is likely per se unconstitutional. The consequence of this holding may be that college athletes in Washington State are not allowed to compete in NCAA competitions. Am. Br. of State of Wash. as Amici Curiae Supp. Resp'ts at 2 n. 1 (citing NCAA Division I Manual, Bylaw 3.2.4.7, http://goomer.ncaa.org/wdbctx/LSDBi/LSDBI.home) (failure to consent to the NCAA testing program will result in a student being ineligible to play). But cf. Hill v. Nat'l Collegiate Athletic Ass'n, 7 Cal.4th 1, 865 P.2d 633, 645, 658-59, 26 Cal. Rptr.2d 834 (1994) (upholding NCAA's random suspicionless drug testing policy, finding that athletes have a diminished expectation of privacy and that private organizations do not have to show a compelling state interest for its programs to be valid).
[6] One study of nearly 5,000 secondary school students reported that "5.4% of boys and 2.9% of girls had used steroids in the past year." Tracy Hampton, Researchers Address Use of Performance-Enhancing Drugs in Nonelite Athletes, 295 J. Am. Med. Ass'n 607 (2006) (citing L.M. Irving et al., 30 J. ADOLESCENT HEALTH 243 (2002)).
[7] We further note below that technology improvements allow much less invasive techniques; both saliva testing and "sweat patches" are now available to test for drugs.
[8] Another example of a student's lowered expectation of reasonable privacy contrasted with a compelling state need is the issue of compulsory vaccinations. The state may enact reasonable regulations to protect the public health and public safety of school children, and compulsory immunization is a permissible exercise of the state's police power. Zucht v. King, 260 U.S. 174, 176, 43 S.Ct. 24, 67 L.Ed. 194 (1922); Jacobson v. Massachusetts, 197 U.S. 11, 24-25, 25 S.Ct. 358, 49 L.Ed. 643 (1905). While this issue is rarely analyzed in a Fourth Amendment context, it also illuminates a special environment and lowered privacy expectation within the educational context.
[9] "(1) A school principal, vice principal, or principal's designee may search a student, the student's possessions, and the student's locker, if the principal, vice principal, or principal's designee has reasonable grounds to suspect that the search will yield evidence of the student's violation of the law or school rules. A search is mandatory if there are reasonable grounds to suspect a student has illegally possessed a firearm in violation of RCW 9.41.280.

"(2) Except as provided in subsection (3) of this section, the scope of the search is proper if the search is conducted as follows:
"(a) The methods used are reasonably related to the objectives of the search; and
"(b) Is not excessively intrusive in light of the age and sex of the student and the nature of the suspected infraction.
"(3) A principal or vice principal or anyone acting under their direction may not subject a student to a strip search or body cavity search as those terms are defined in RCW 10.79.070."
[10] See Nat'l Inst. on Drug Abuse, Commonly Abused Drugs available at http://www.nida.nih.gov/DrugPages/DrugsofAbuse.html (last modified Jan. 2, 2008) (listing the intoxicating effects of different drugs).
[11] Justice O'Connor also noted that "any distress arising from what turns out to be a false accusation can be minimized by keeping the entire process confidential." Acton, 515 U. S at 677, 115 S.Ct. 2386 (O'Connor, J., dissenting).
[12] "The legislature finds that illegal drug activity and weapons in schools threaten the safety and welfare of school children and pose a severe threat to the state educational system. School officials need authority to maintain order and discipline in schools and to protect students from exposure to illegal drugs, weapons, and contraband. Searches of school-issued lockers and the contents of those lockers is a reasonable and necessary tool to protect the interests of the students of the state as a whole."
[13] Although there is no Washington case law as of yet upholding random suspicionless searches in the school context, suspicionless searches of lockers are statutorily authorized in schools. "RCW 28A.600.240 School locker searchesNotice and reasonable suspicion requirements. (1) In addition to the provisions in RCW 28A.600.230, the school principal, vice principal, or principal's designee may search all student lockers at any time without prior notice and without a reasonable suspicion that the search will yield evidence of any particular student's violation of the law or school rule."
[14] Identifying adolescents and children who use performance-enhancing substances can even be difficult for physicians. Hampton, supra, at 607.
[15] See, supra, note 2 regarding drug testing of college athletes.
[16] Of course, random suspicionless drug tests could be implemented based on parental consent without meeting these requirements. During the 1999-2000 school year, 184 out of 280 students in grades 7-12 in Wahkiakum School District participated in at least one sport. All of the students signed consent forms, and only six forms were signed under protest by a student or a parent. CP at 486. I recognize the claim that some consent forms were not truly voluntary.
[17] But see note 20, infra, discussing less invasive saliva and "sweat patch" tests.
[18] Here again, the legislature could address an issue to which it is suited by the fact-finding hearings, deliberative process, and constitutional role.
[19] "Article I, section 7, forbids use of pretext as a justification for a warrantless search or seizure because our constitution requires we look beyond the formal justification for the stop to the actual one." State v. Ladson, 138 Wash.2d 343, 353, 979 P.2d 833 (1999).
[20] See, e.g., Office of Nat'l Drug Control Policy, Developing a Testing Program: Pros and Cons of the Various Drug Testing Methods, available at http://www.whitehousedrugpolicy.gov/publications/ drug_testing/testing.html (last modified Sept. 20, 2002) (contrasting different methods of drug testing).